# WILLIAM WALSH *vs.* MARY V. MCBRIDE, and others.

*Subrogation—Vendor's lien—Resulting trust.*

W. and M. purchased certain real estate, and agreed that each should pay one-half of the consideration. When the deed was delivered to them, M. was not prepared to pay his half of the purchase money, and W. paid the whole amount. Subsequently a note was executed by M. and endorsed by W. to enable him to realize the amount paid. This note W. procured to be discounted, and he received the proceeds. It was renewed several times, and was paid in part by rents received from the property. HELD:

1st. That W. was not entitled, by subrogation to the rights of the vendor of the property, to a lien or charge upon the interest of M. therein, for the purchase money thereof paid by W., as the vendor's lien was completely extinguished by the payment of the whole purchase money, and by the conveyance of the legal title to the real purchasers.

2nd. That a resulting trust was not created in favor of W. by his payment of the whole purchase money, it clearly appearing that it was the intention of both W. and M. that M. should have a beneficial interest in the property, it having been bought to enable them to reimburse themselves for losses they had sustained as sureties for one H. a former owner of the property, and the bill of complaint claiming a lien on the interest of M. as a tenant in common.

APPEAL from the Circuit Court for Alleghany County, in Equity.

To the statement of the case, as contained in the opinion of the Court, the following agreement of counsel taken from the record, is added:

"It is agreed in this case that William Walsh and Frederick Minke contracted with A. M. Hedian to buy from him the property mentioned in these proceedings, and to pay therefor fourteen hundred dollars in cash on

the delivery of the deed for the same, of which said Walsh was to pay one-half and said Minke one-half. The said Hedian executed the deed, and when it was tendered by him the said Minke did not have the money in hand to pay his half, and said Walsh paid the purchase money in full.

"The deed was then delivered and recorded, and the said Minke took charge of the property for said Walsh and himself. The deed was dated May 19th, 1884, and delivered and recorded July 3rd, 1884, and the money was paid by said Walsh to said Hedian July 3rd, 1884, when the deed was delivered, and said Hedian would not deliver said deed until the money was paid in full.

"On September 26th, 1884, a note was signed by Frederick Minke, and endorsed by William Walsh and Ferdinand Williams, for fourteen hundred dollars, to enable said Walsh to realize the said fourteen hundred dollars paid by him to said Hedian, and said Walsh on that date received said sum of fourteen hundred dollars. That note was renewed several times for fourteen hundred dollars, and on June 20th, 1885, was reduced to $1,322.50, the difference having been paid by rents received from the property purchased from said Hedian by said Walsh and Minke. The said note of $1,322.50 was renewed, and the last time fell due after the death of Frederick Minke, who died in December, 1885. The last note is still held by the Second National Bank of Cumberland, which discounted the original note and renewals thereof, and it has not yet been paid.

"It is further agreed, that the property was originally owned by F. Haley, and that said Minke and Walsh had lost, as endorsers of said Haley, and purchased this property with the hope that they could sell it to some advantage, and it was purchased of Hedian who had purchased the property of the executor of F. Haley; Walsh and

Minke were not joint endorsers of Haley's note, but separately endorsed separate notes."

The cause was argued before ALVEY, C. J., MILLER, IRVING, BRYAN, and McSHERRY, J. `

*William Walsh,* for the appellant.

Minke and the appellant jointly agreed to purchase the property for cash, each to pay half and own half. When the deed was ready to be delivered Minke could not pay, and appellant paid the whole purchase money. The seller would not convey without payment, and could not be required to do so. Neither would he, nor could he, be required to make a deed to appellant for an undivided half. The sale of the whole property to both was an entirety, and the appellant could get no title to his part unless he paid for the whole. *Patterson, et al. vs. Preston, Trustee, et al.,* 51 *Md.,* 197–8; *Price vs. Griffith,* 1 *DeG., Mac. & Gor.,* 80; *Davis vs. Symonds,* 1 *Cox,* 402.

Under the contract of purchase appellant was bound to the seller for the whole purchase money, but was as between him and Minke principal debtor for one-half and surety of the co-purchaser for the other half. The vendor's lien and appellant's obligations were created by and simultaneously with the contract of sale; and in the very act of executing the contract of sale and getting in his own title under it, the appellant, as a joint contractor and as surety *inter se* for Minke as to one-half, was compelled to pay off the vendor's lien on the whole property. His rights grew from the very root of the title and not from anything collateral or subsequent. His primary relations to the matter placed him under a legal necessity to pay the whole purchase money in order to get title for his half and relieve himself as a joint contractor for the whole.

In such a case we believe it has always been con-
sidered, and long since decided, in Maryland and other
States, that a co-purchaser is a surety for the part to be
paid by his associates; and that, if obliged to pay more
than his own share to relieve himself of the joint contract
or to get in the title for his own share, he will be subro-
rogated in equity to the vendor's lien and all the rights
of the vendor, whose claim he was obliged to pay off by
the legal and moral compulsion of the situation.     *Crafts
vs. Mott*, 4 *N. Y.*, 604; *Marsh vs. Pike*, 10 *Paige*, 505;
1 *Pothier by Evans, N.*, 264; *Pratt and others vs. Law &
Campbell*, 9 *Cranch*, 456; *Winder vs. Diffenderffer*, 2
*Bland*, 199, *text and note Meluy vs. Cooper*, precisely this
case.    *Barroll Ch. Pr.*, 402, and *Dryden vs. Hanway*,
there cited; *Purdy vs. Purdy*, 3 *Md. Ch.*, 547; *Ghiselin
et al. vs. Ferguson*, 4 *H. & J.*, 552; *Peters vs. Magruder*,
11 *G. & J.*, 228; *Welch vs. Parran, et al.*, 2 *Gill*, 329;
*B. & O. R. R. vs. Trimble*, 51 *Md.*, 99 *at* 107; *Brant on
Suretyship*, sec. 262; *Wheatley's Heirs vs. Calhoun*, 12
*Leigh*, 264; *Dolyns vs. Rawley*, 77 *Va.*, 537; *McNeil vs.
Miller*, 29 *West Va.*, 480; *Winston vs. McAlpine*, 65 *Ala.*,
377; *Coe vs. New Jersey Midland R. R. Co.*, 31 *N. J.
Eq.*, 105 *at* 133–7.

In 119 *Pa. St.*, 631, the Court says: "The rule em-
braces purchasers in common of an estate bound by a
joint lien.    As between themselves, the purpart of each
is liable to contribute only its proportion toward the
discharge of the common burden, and beyond this it is
to be regarded simply as the surety of the remaining
purparts.    In this respect they are to be treated as the
several estates of joint debtors, one being surety of the
other; and if the purpart of the one is called on to pay
more than its due proportion, the tenant, upon the prin-
ciple settled in *Fleming vs. Beaver*, 2 *Rawle*, 138, *Croft
vs. Moore*, 9 *Watts*, 451, and *Neff vs. Miller*, 8 *Pa.*, 347,
is entitled to stand in the place of the satisfied creditor

to the extent of the excess which ought to have been paid out of the other shares. *Gearhart vs. Jordan,* 11 *Pa. St.,* 331."

There is no question here of the method of assigning the lien. Payment by a surety, or one obliged to pay to protect some interest of his own, operates as an assignment by force of law. Even the unassignable priority of the State passes *ipso facto* to a surety on paying its claim. *Hollingsworth vs. Floyd,* 2 *H. & Gill,* 87; *Orem, Ex'r vs. Wrightson,* 51 *Md.,* 34.

The appellant was substantially, even literally, surety for Minke for the excess he was obliged to pay over his own half, and is strictly entitled to subrogation. But this equitable doctrine extends where there is no relation of surety and no personal liability, but a party pays in aid of his own title, or to protect some interest of his own. As illustrating this, see *Milholland vs. Tiffany,* 64 *Md.,* 455; *Robertson, et al. vs. Mowell, et al.,* 66 *Md.,* 538; *Cole vs. Malcolm,* 66 *N. Y.,* 363; *Twombly vs. Cassidy, et al.,* 82 *N. Y.,* 155; *Gans vs. Thieme,* 93 *N. Y.,* 225; *Everson vs. McMullen,* 113 *N. Y.,* 293; *Lidderdale's Ex'rs vs. Robinson's Adm'r,* 2 *Brock.,* 159; *Stiger vs. Bent,* 111 *Ill.,* 328; *Brice's Appeal,* 95 *Pa. St.,* 145; *Cottrell's Appeal,* 23 *Pa. St.,* 294. The lien runs against the appellees. *Schwarz vs. Stein,* 29 *Md.,* 117; *Christopher vs. Christopher,* 64 *Md.,* 583.

The supposition of *Sugden, ch.* 20, *sec.* 1, *pl.* 16, *vol.* 2, *7th Am. Ed. of* 1851, *top page* 397, is contrary to our own and other decisions cited. It does not seem to refer to a case of payment at the time of getting the title, as it speaks of no resulting trust arising at an after period, which would seem to show the money was paid after the title was acquired. His, "it seems," rests on no published authority, and he states in the note that the decree does not authorize his observation, but that it seems to follow from what fell from the Master of the Rolls,

which he does not report to us. It might be that in a joint tenancy in England where survivorship gives the whole estate to one, that a party paying all would not be subrogated (though he does not speak of subrogation) but we have no joint tenancy. It would appear to be rather unsafe to pass over our own decisions and follow this suggestion, resting on no known decision and on no clear statement of facts. And the case cited in *pl.* 17 of the joint tenants, and one renewing the lease and paying the fines being decreed to have a lien on the other tenant's half therefor, is contrary to his supposition if the latter applies to any such state of facts as we have here. *Hamilton vs. Denny*, 1 *Ball & Beatty*, 199.

In fact *Sugden's, ch.* 18, on vendor's lien shows that this doctrine of equity was not at first well understood and had a hard struggle to get into shape against the narrowness of common law lawyers. But with us Kent, Story and others, imbued with the principles and spirit of equity, elucidated and applied it from an early period, and left us without need of looking to English authors for light on the subject.

This case bears no resemblance to *Alderson vs. Ames*, 6 *Md.*, 53, where the purchaser gave a mortgage to a third party for balance of settled accounts, and afterwards claimed part of the mortgage debt was used to pay for the land; or *Heuisler vs. Nickum*, 38 *Md.*, 270, where the purchaser borrowed money from a third party to pay for the property and gave him his own mortgage therefor.

*A. Hunter Boyd*, for the appellees.

As the lien relied on in the bill is that, "by subrogation to the rights of the vendor of said land," let us inquire (1st) whether any such rights ever existed, and (2d) whether they were not extinguished if they did ever exist—particularly so far as creditors are concerned.

The purchase money was paid in full to the vendor before he delivered the deed. There are so many cases in this State, as well as elsewhere, on this subject, that we will not undertake to refer to many of them. As this equitable lien exists for unpaid purchase money there is of course no lien when the purchase money is paid. There was, therefore, no vendor's lien in favor of Hedian, the vendor, to which the appellant could be subrogated. This is not a case in which the vendor delivered his deed upon receipt of a note, with or without security, but the purchase money was actually paid.

In *McGonigal vs. Plummer*, 30 *Md.*, 428, the surety on the bond for purchase money undertook to maintain a priority over other creditors on the theory that he was entitled to a vendor's lien by subrogation. But this Court held that the lien never existed, as taking a bond with security, when the legal title had passed, raised the presumption that the lien was intended to be waived. "This presumption may, it is true, be repelled by proof of an express agreement that the lien shall be retained, but the *onus* of such proof is upon the party seeking to enforce the lien." *Ib.* 429; See also *Schwarz vs. Stein*, 29 *Md.*, 119; *Carrico vs. Farmers and Merchants' National Bank*, 33 *Md.*, 242.

We are not aware of any case that would permit the surety of a purchaser of land to enforce the vendor's lien under such circumstances as we have in this case. Here the deed was delivered, passing the legal title to the grantees. The deed on its face acknowledges receipt of the purchase money, and there is no evidence whatever of any agreement or intention to retain a vendor's lien. The cases 33 *Md.*, 242, 30 *Md.*, 428, and 29 *Md.*, 119, state the law of this State in such cases.

If Mr. Walsh desired or intended to protect himself he should have taken the deed in his name or a mortgage from Minke. But the property was conveyed to the two.

There is no evidence of any intention on the part of Walsh to have a lien upon the interest of Minke. On the contrary, the facts show that he simply looked to the personal responsibility of Minke, and he in point of fact took his note and obtained the money on it. As is said in the case of *Collinson vs. Owens*, 6 *G. & J.*, 11: "There is nothing in the transaction from which such an equity could arise. John Collinson does not appear to have looked to the land, as a security for his debt, either at the time of the loan or at any subsequent period. When the money was advanced, the agreement was that Edward should give his note for the amount. The only security demanded, or to have been given, was the personal responsibility of Edward." In this case such was evidently the case as shown by the fact that a note was given, and was renewed for a number of times—covering over a year when Minke died. Mr. Walsh was in no sense a surety of Minke. So far as Hedian is concerned he in all probability never knew who advanced the money, but if he had been a surety or stood in that relation to Minke, the cases above cited, we think, show that there was no lien, and hence it is immaterial whether he was a surety or not, or whether he occupied the position of surety.

In *Groff vs. Rohrer*, 35 *Md.*, 336, the Court in quoting from *Cook vs. Fountain,* says: "The law never implies, the Court never presumes a trust but in case of absolute necessity. The reason of this rule is sacred; for if the Chancery do once take liberty to construe a trust by implication of law, or to presume a trust unnecessarily, a way is opened to the Lord Chancellor to construe or presume any man in England out of his estate; and so at last every case in Court will become *casus pro amico.*"

There is nothing in this case that raises a resulting trust. The facts are against any such presumption. If Mr. Walsh had looked to the property he would not have taken a deed to Minke and himself, but to himself alone.

Walsh *vs.* McBride, *et al.* ·

"If two agree to purchase and one furnishes all the money and takes the title to himself no trust results to the other; and so if two agree to purchase and one pays the whole consideration money, and the title is taken to the two, no trust results to the one who paid the whole; he can only enforce repayment of one-half the consideration money." 1 *Perry on Trusts, sec.* 153, (*page* 149 *of 3rd Ed.*)

There is nothing in this case to show that it was ever intended for Mr. Walsh to have a lien upon Minke's interest. The facts prove the contrary. On the 26th of September, 1884, he received not only what he had paid for Minke but what he had paid for himself on account of the purchase money of this property. It is true he endorsed the note, but that was not to raise money to pay Hedian, for he was already paid. If no one was interested but the Minke heirs it might make but little difference to them whether Mr. Walsh succeeded or not in this proceeding, for of course he could resort to Minke's estate for payment.

But the purpose of the bill is to give him priority over others. These other parties are to be considered. The cases in this State, as well as elsewhere, protect *bona fide* purchasers, and creditors without notice, from secret trusts and liens. *Brooks vs. Dent,* 1 *Md. Ch. Dec.,* 528; 29 *Md.,* 119; 30 *Md.,* 428; 2 *Jones on Liens, sec.* 1076.

If Minke's estate will not pay the holder of the note and other creditors in full, as it is admitted it will not, then there is no equity in giving priority to appellant. If it will, than he can sustain no loss, as the note will protect him.

The dealings between these parties, as set out in the agreed statement of facts, indicate in the strongest possible way that for the mutual accommodation of each other Mr. Walsh first paid the purchase money, and then, Mr. Minke repaid him and also procured his note, the amount

paid by Mr. Walsh for himself. If there had been any lien existing the subsequent conduct of these parties show a waiver of it. As Mr Walsh has not actually paid the note the right of subrogation does not arise at any rate. *Sheldon on Subrogation, sec.* 127.

McSHERRY, J., delivered the opinion of the Court.

William Walsh and Frederick Minke purchased from Adrian Hedian certain real estate for the sum of fourteen hundred dollars, and agreed between themselves that each should pay one-half of the stipulated consideration. When Hedian delivered the deed which conveyed the property to Walsh and Minke, Minke was not prepared to pay his half of the purchase money, and Mr. Walsh paid the whole amount. The deed was delivered July 3rd, 1884. On September 29th of the same year a note was signed by Minke, and endorsed by Mr. Walsh and Mr. Williams, for $1400, to enable Mr. Walsh to realize the said $1400 paid by him to Hedian. This note Mr. Walsh procured to be discounted, and he received the proceeds. The note was renewed several times, and was finally reduced to $1,322.50 by payments made out of the rent received from the property. The last renewal is now long overdue and unpaid. The property was formerly owned by F. Haley. Both Walsh and Minke had lost as endorsers of Haley, and they "purchased this property with the hope that they could sell it to some advantage." In January, 1886, Minke died, and in June following Mr. Walsh filed a bill in the Circuit Court for Alleghany County, against Minke's heirs-at-law, charging that he, Walsh, and "Minke became *tenants in common of said land,* and said Minke's *interest therein* became subject to a lien in favor of" Walsh "for the purchase money therefor paid by him," and that Walsh "was and is entitled *by subrogation to the rights of the vendor of said land,* the said Hedian,—to a

lien or charge upon said Minke's undivided interest in said land for the purchase money thereof paid by '' Walsh. ' The defendants answered the bill, and denied the existence of any such lien. After hearing, the Circuit Court dismissed the bill, and from that decree this appeal was taken.

It will be observed that the single theory upon which the bill is founded is that Mr. Walsh is "entitled by subrogation to the rights of the vendor of said land." In other words, he invokes the familiar doctrine that a surety who pays the purchase money is entitled by subrogation to the lien of the vendor. *Winder vs. Diffenderffer,* 2 *Bland,* 166; *Ghiselin and Worthington vs. Fergusson,* 4 *H. & J.,* 522; *Magruder vs. Peter,* 11 *G. & J.,* 219; *Welch vs. Parran, et al.,* 2 *Gill,* 320. But to entitle him to relief on this ground he must have been a surety for Minke, and as such surety bound for Minke's share of the purchase money; he must have paid that debt of Minke's, and the vendor's lien must not have been waived, abandoned, or extinguished. Had Mr. Walsh, instead of paying the purchase money, become surety on a bond or note of Minke to Hedian for Minke's share of the purchase money, and had the deed been then delivered by Hedian, and had there been no express preservation of the vendor's lien, there can be no doubt that the lien would have been extinguished. And had Mr. Walsh subsequently paid the bond or note he could have claimed no priority over Minke's other creditors. This is the specific proposition decided in *Carrico vs. The Farmers and Merchants' Nat. Bk.,* 33 *Md.,* 235; and that case seems to us to be decisive of this. In the case just cited it appeared that Waters purchased two farms from Williams. By the terms of the contract the purchaser was to pay a part of the purchase money on January 1st, 1860, and the balance in four equal annual instalments, to be secured by bond, with approved security. The

cash payment was made, and a bond, with Carrico and others as sureties thereon, was given for the deferred payments, and thereupon Williams conveyed the farms to Waters.　Subsequently Waters, being heavily indebted, applied for the benefit of the insolvent laws, and was duly discharged thereunder.　Carrico, one of the sureties, paid the purchase money due on the land, and in the distribution of the insolvent's assets claimed that he was by subrogation entitled to the lien held by the vendor for the unpaid purchase money.　Upon the authority of *Schwarz vs. Stein*, 29 *Md.*, 112, *McGonigal vs. Plummer*, 30 *Md.*, 422, and in conformity with the great preponderance of opinions of the other American Courts upon this subject, it was held that when the legal title has been conveyed to the vendee, and he has given his note, with the responsibility of a third person thereon as security for the unpaid purchase money, the lien will be considered as waived, unless it be made plainly to appear that it was the intention of the parties that it should be retained; and that in such case the *onus* of showing the intention to preserve the lien rests with the vendee, or those claiming in his stead.　The claim set up by Carrico, the surety, was disallowed, because the vendor's lien had been extinguished.　Now, the payment by Mr. Walsh for Minke of the latter's share of the purchase money in cash, assuming that the payment was made by Walsh as surety for Minke, placed Walsh in no better position than he would have occupied had he become surety on a bond or note of Minke's; because there was no preservation whatever of the vendor's lien; and in fact, there was no longer any such lien in existence.　By the payment of the whole purchase money in cash, and by the conveyance of the legal title to the real purchasers, the equitable lien of the vendor was completely extinguished.　Being thus extinguished, the vendor had no longer any lien or charge upon the pro-

perty,‘and Mr. Walsh was clearly therefore, not entitled, by subrogation or otherwise, to a lien or charge which had actually ceased to exist.

There is nothing in the case of *Meluy vs. Cooper* cited by Chanceller BLAND in a note to *Winder vs. Diffenderffer, supra*, at all in conflict with the conclusion just announced. The facts in *Meluy vs. Cooper* were these: One Sherwood, as trustee under a decree, sold certain property to Cooper; Cooper agreed to allow Meluy to become a joint purchaser, each to pay one-half of the purchase money, and Cooper took possession, and then died, without having paid any part of the purchase money, and Meluy afterwards paid the money, *but no deed was obtained from the trustee.* Meluy claimed a lien on Cooper's half for the purchase money which he, Meluy, *became bound as surety* to pay, and had in fact paid. The relief prayed was for a sale of the property to reimburse the surety. The defendants *admitted* these allegations, and a decree was passed for a sale. There are several features of marked difference between the case last cited and the one at bar. Meluy was not a joint purchaser from the trustee, but was surety for Cooper. Between Cooper and himself there was an independent contract that Meluy should purchase a one-half interest. When Meluy, who was bound as surety, paid the purchase money to the trustee, no deed was given, and the surety was allowed to have the benefit of the equitable lien of the vendor. This was undoubtedly correct, because that lien had not been waived or extinguished, as it certainly was in the case now before us.

We do not deem it necessary to review the decisions of other Courts to which our attention has been called, because we think the cases cited from our own reports are entirely conclusive on this subject.

It has been suggested that the payment by Mr. Walsh of the whole purchase money, under the circumstances

stated, created a resulting trust in his favor. In our opinion that position is not tenable.

In all species of resulting trusts, *intention* is an essential element, although that intention is never expressed by any words of direct creation. 3 *Pom. Eq., sec.* 2031. As the trust results to the real purchaser by operation of law, which is merely an *arbitrary implication* in the absence of *reasonable proof* to the contrary, the nominal purchaser is at liberty to rebut the presumption by the production of parol evidence, showing the *intention* of conferring the beneficial interest. The trust will not be raised in opposition to the declaration of the person who advances the money, nor in opposition to the agreement of the parties on which the conveyance is founded, or to the obvious purpose and design of the transaction. 1 *Lewin on Trusts, (star page)* 170; *Rider vs. Kidder,* 10 *Ves.,* 360; *Garrick vs. Taylor,* 29 *Beav.,* 79; *Standing vs. Bowring, L. R.,* 27 *Ch. Div.,* 341; *Botsford vs. Burr,* 2 *John. C.,* 416; *Steere vs. Steere,* 5 *John. C.,* 18; *White vs. Carpenter,* 2 *Paige,* 265; 2 *Story Eq., sec.* 1202; *Adams Eq.,* 33; *Hill on Trustees,* 96 *and* 97. The evidence to rebut need not, perhaps, be as strong as evidence to create a trust. *Nicholson vs. Mulligan,* 3 *Ir. Rep. Eq.,* 308. When a clear understanding is had at the time the purchase is made, the money paid, and the deed taken, by which understanding the nominal purchaser was to have both the *legal* and the *beneficial* interest, it is incompetent for the person who paid the purchase money to put a different construction upon the transaction at a subsequent time, and claim a resulting trust in the estate contrary to the understanding and intention at the time. 1 *Perry on Trusts, (3rd Ed.) sec.* 140.

It is perfectly clear from this record, that it was the intention of both Mr. Walsh and Minke that Minke should have a legal and a beneficial interest in the property. It was bought by them to enable them both to

reimburse themselves for the losses they had sustained as sureties for Haley. This of itself would rebut the mere legal implication arising from the payment of the purchase money by Mr. Walsh. But in addition to this, the theory of the bill of complaint is utterly at variance with any idea of a resulting trust. The bill claims a lien on Minke's *interest as a tenant in common.* For such a lien to exist Minke must have had a beneficial interest, and not merely a naked legal title in trust for Walsh. If Minke had a beneficial interest, he was clearly not a trustee for Walsh, and if he was a tenant in common he had a beneficial interest as well as the legal title. Hence, the suggestion that he held as trustee for Walsh is distinctly repudiated by the bill itself. To support a resulting trust, every material averment of the second paragraph of the bill must be not merely disregarded, but actually reversed. The allegation that Walsh and Minke were tenants in common must be treated as though it asserted that Minke had no beneficial interest in the land at all; and the statement that Minke's *interest* in the property became subject to a lien in favor of Walsh must be read as though it charged that Minke was only a trustee for Walsh, holding the legal title for the benefit of the latter. In fine, the *intention* of the parties must be overthrown, and a presumption of law substituted therefor, even though that presumption is allowed to prevail only when there are no circumstances shown which indicate the existence of a different purpose. Looking to the face of the bill of complaint and the agreed statement of facts, the substance of which has already been set forth, it is, we conceive, impossible to escape the conclusion that it was intended Minke should have a beneficial interest in the property. Upon no other hypothesis can a satisfactory explanation be given of the $1400 note transaction. The moment it appears or is conceded that it was originally intended

Minke should have a beneficial interest in the property, as well as the legal title, the foundation of a resulting trust is cut away; because the legal implication upon which alone such a trust depends can never, as we have seen, exist in contravention of the agreement of the parties.　Hence the money advanced by Mr. Walsh for Minke must be treated as a mere loan upon the personal credit of the borrower.

Entertaining these views, we must affirm the decree passed by the Circuit Court.

*Decree affirmed.*

(Decided 6th February, 1890.)

BRYAN, J., filed the following dissenting opinion:

William Walsh filed a bill in equity for the purpose of obtaining a decree for the sale of certain real estate in Alleghany County.　It is shown by an agreed statement of facts that Walsh and Minke contracted with Hedian for the purchase of the property at the price of fourteen hundred dollars in cash; one-half to be paid by Walsh and the other half to be paid by Minke; that Walsh paid the whole purchase money, and thereupon the deed was delivered and recorded.　The deed conveys the property in the usual form to William Walsh and Frederick Minke.　Minke is now dead and this proceeding is against his widow and heirs-at-law, and the husbands of certain of the female heirs.　The bill was dismissed by the Circuit Court.

By force of the Act of 1822, chapter 162, Walsh and Minke were tenants in common of this real estate; and not joint tenants as they would have been at common law, according to the terms of the deed.　They held, one undivided half to the one and one undivided half to the other; in the same manner as if there had been separate deeds for these moieties.　In this way the legal

title to one undivided moiety was conveyed to Minke, while the consideration for this moiety, as well as for the other, was wholly paid by Walsh. The rights which arise from a transaction of this kind are well settled. Where the title to real estate is taken in the name of one person and the purchase money is paid by another, there is a resulting trust in favor of the one who pays the money. The money purchases the property, and the owner of the money is in equity the owner of that which the money purchases. A trust of this kind arises by operation of law and is, by force of the eighth section of the Statute of Frauds, expressly preserved as it would have been if the Statute had not been passed; while by the seventh section all other trusts must be manifested and proved by writing. As the argument at the bar proceeded on a different view of this case, it is necessary to examine it with some particularity. The statement of facts is distinct that "Walsh paid the purchase money in full," at the time of the delivery of the deed. Nearly three months after the deed was delivered and recorded, a note for fourteen hundred dollars was signed by Minke and endorsed by Walsh and Ferdinand Williams, "to enable," in the language of the agreement "said Walsh to realize the said fourteen hundred dollars paid by him to said Hedian; and said Walsh on that date received said sum of fourteen hundred dollars." The note was renewed several times for fourteen hundred dollars, and on June 20th, eighteen hundred and eighty-five was reduced to $1322.50; the difference having been paid by rents received from the property. The note for $1322.50 was renewed and the renewal became due in December, 1885, after the death of Minke. It is still unpaid and is held by the Bank which discounted the original note, and the several renewals. It is seen that, subsequently to the purchase, an attempt was made to re-imburse Walsh for his outlay; but it was unsuccessful, inasmuch

as the note was not paid; and Walsh remains liable for the amount of it as first endorser. The maker is dead, and it is stated in the answer that he was greatly involved when he died; and that a creditors' bill has been filed for the sale of his real estate.

A few authorities will be cited. There is the celebrated opinion of Chief Baron COMYN in *Dyer vs. Dyer*, 2 *Cox Chancery Cases*, 92 *and* 93. "The clear result of all the cases, without a single exception, is, that the trust of a legal estate, whether freehold, copyhold, or leasehold; whether taken in the names of the purchasers and others jointly, or in the name of others without that of the purchaser; whether in one name or several; whether jointly or successively, results to the man who advances the purchase money. This is a general proposition supported by all the cases, and there is nothing to contradict it; and it goes on a strict analogy to the rule of the common law, that where a feoffment is made without consideration, the use results to the feoffor." Scarcely less in weight is the decision in *Botsford vs. Burr*, 2 *Johnson's Chancery Reports*, 405. Chancellor KENT says: "The trust must have been coeval with the deeds, or it cannot exist at all. After a party has made a purchase with his own moneys or credit, a subsequent tender, or even re-imbursement, may be evidence of some other contract, or the ground for some other relief, but it cannot, by any retrospective effect, produce the trust of which we are speaking. There never was an instance of such a trust so created, and there never ought to be, for it would destroy all the certainty and security of conveyances of real estate. The resulting trust, not within the Statute of Frauds, and which may be shown without writing, is when the purchase is made with the proper moneys of the *cestui que trust*, and the deed not taken in his name. The trust results from the original transaction, at the time it takes place, and at no other time;

and it is founded on the actual payment of money, and on no other ground. It cannot be mingled or confounded with any subsequent dealings whatever." It is believed that these cases have been universally followed without any qualification or modification whatever. Assuredly the doctrines stated in them have been distinctly declared in this State in *Hollida vs. Shoop,* 4 *Md.,* 465, and *Green vs. Drummond,* 31 *Md.,* 81.

If Walsh had loaned the money to Minke, it would have been Minke's own money which paid for the land. But such is not the fact as stated in the agreement. Subsequently to the purchase an effort was made to repay the money to Walsh ·by means of the note. It was, however, intended to repay him the entire sum of fourteen hundred dollars, and not merely the portion which paid for the moiety of the land embraced in Minke's legal title. This note was not paid and the purpose of repayment failed. It is probable that there was an agreement that Walsh should convey to Minke the entire interest in the land when the note was paid. But we are not required to make conjectures on this subject. The agreement, whatever it was, if it affected the land or any interest in it, was void unless it was in writing. We are not to be understood as saying that if Minke had actually paid the fourteen hundred dollars, he would have been without remedy, because of the void nature of the agreement. He might have obtained compensation in the mode decreed in *Green vs. Drummond.* Walsh holding the legal estate in one-half the land, and an equitable estate in the other half, could not validly contract for the sale of either interest except in writing. Says Judge STORY in *Smith vs. Burnham,* 3 *Sumner,* 461: "A contract for the sale of an equitable estate in lands, whether it be. under a contract for the conveyance by a third person, or otherwise, is clearly a sale of an interest in the lands within the Statute of Frauds." And

in *Bartlett vs. Pickersgill*, 1 *Eden*, 343, where a defendant had purchased land with his own money, and it was attempted to show that he had made a verbal agreement with the plaintiff to buy the land for him, the evidence was rejected. The Lord Keeper said: "The question is, whether this evidence is admissible or not? which depends upon the Statute of Frauds. One great end of that Statute was, to prevent persons coming into this Court pretending that they were entitled to trusts of long terms, and sometimes of the freehold, which gave room to fraud and perjury. I think the allowing this evidence would be to overturn the Statute. The Statute says, that there shall be no trust of land, unless by memorandum in writing, except such trusts as arise by operation of law. Where money is actually paid, there the trust arises from the payment of the money, and not from any agreement of the parties. But this is not like the case of money paid by one man, and the conveyance taken in the name of another: in that case the bill charges that the estate was bought with the plaintiff's money. If the defendant says he borrowed it of the plaintiff, then the proof will be whether the money was lent or not: if it was not lent, the plaintiff bought the land; but as here the trust depends on the agreement, if I establish the one by parol, I establish the other also." This opinion has received the cordial approval of Kent and Story, and has been made the basis of many well considered judgments. My conclusion is that Walsh became the equitable owner of this land by virtue of the payment of the purchase money, and that he is entitled in equity to the rents and profits.

The learned Judge of the Circuit Court in his opinion made a citation from *Sugden on Vendors*, which may militate against what we have said. The very great reputation of the author, and the high respect in which all his opinions are deservedly held induce me to quote

the passage in full.  It is as follows, "It seems that where two or more persons purchase an estate, and one, for instance, pays all the money, and the estate is conveyed to them both, the one who paid the money cannot call upon those who paid no part of it to repay him their shares of the purchase money, or to convey their shares of the estate to him ; for by payment of all the money he gains neither a lien nor a mortgage, because there is no contract for either ; nor can it be construed a resulting trust, as such a trust cannot arise at an after period; and, perhaps, the only remedy he has, is to file a bill against them for a contribution." 2 *Sugden on Vendors, page* 429.  Perhaps the meaning of the learned jurist has been misunderstood.  He says "nor can it be construed a resulting trust, as such a trust *cannot arise at an after period;*" these words would seem to imply that he had in view a case where the purchase money. was paid subsequently to the execution of the deed.  If this be the meaning, it is in accord with all the authorities.  We will, however consider the passage as it was viewed by the learned Court ·below.  The text rests on the authority of an unreported case, which ·is cited in a note with a statement that "the decree does not authorize the observation, but the author conceives it to follow, from what fell from the Master of the Rolls at the hearing."  It is to be noted that in the case mentioned the purchasers were joint tenants, and not tenants in common.  The rights of these two descriptions of tenants are very different.  But as the trust ·is created by the payment of the purchase money, equity must raise it against the legal ·title as in other cases ·of trust, and the form of the title, will be no greater obstacle in one case than in the other.  It was held in *Brothers vs. Porter,* 6 *B. Monroe,* 107, that where land is purchased by two persons and a joint deed executed to them, a trust results to each purchaser to the extent

of the consideration paid by him. And in *Rigden vs. Vallier*, 2 *Vesey, Senior*, 258, Lord HARDWICKE used this language: "It has been said indeed, that if two men make a purchase, they may be understood to purchase a kind of chance between themselves, which of them shall survive: but it has been determined, that if two purchase, and one advances more of the purchase money than the other, there shall be no survivorship, though there are not the words *equally to be divided, or to hold as tenants in common;* which shows how strongly the Court has leaned against survivorship, and created a tenancy in common by construction on the intent of the parties." This is a distinct declaration that where the legal title is a joint tenancy, the fact that one of the purchasers has paid the greater portion of the purchase money will make the equitable title a tenancy in common; and *this*, of course, determines that the equitable interest of each purchaser shall be proportionate to the amount of money paid by him. We may also cite *Butler vs. Rutledge*, 2 *Coldwell*, 11, where it was held: "It is a well settled principle, that when A and B are the purchasers of land, and it is conveyed to them jointly, and A pays all the purchase money, a resulting trust will thereby be created in favor of A, and B holds whatever interest he acquired by the conveyance in trust for A."

The complainant in his bill claimed a lien on Minke's portion of the land for one-half of the purchase money and prayed as specific relief a sale of the land and a distribution of the proceeds of sale; there was also a prayer for general relief. We do not think that the complainant is entitled to the specific relief mentioned; but it is well settled that under the general prayer the Court may give him such proper relief, as is consistent with the allegations of the bill of complaint. *Story's Equity Pleading, sec.* 40. The pleadings and proofs show

that he is the equitable owner of Minke's portion of the land, and he has a right to a conveyance of the legal title. A trustee should be appointed to convey it to him. It has been suggested that the rights of Minke's creditors are involved in this proceeding. No circumstances appear in the record from which a lien on Walsh's equitable title could be inferred in favor of anybody. If any such lien exists it may be enforced in another suit, as the decree in this case will conclude only the rights of the parties to this suit.

(Filed 6th February, 1890.)