## STATE ROADS COMMISSION OF MARYLAND
### v. JOHNSON ET UX.

[No. 182, September Term, 1959.]

494

*Decided June 8, 1960.*

*Motion for rehearing filed July 6, 1960, denied August 2, 1960.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ., and TUCKER, J., Associate Judge of the Eighth Judicial Circuit, specially assigned.

*William J. McWilliams, Special Attorney,* with whom were *C. Ferdinand Sybert, Attorney General,* and *Joseph D. Buscher, Special Assistant Attorney General,* on the brief, for the appellant.

*Linwood L. Clark* and *C. Maurice Weidemeyer* for the appellees.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a decree declaring that the appellees are vested with fee simple title to a strip of land lying within the old line of the Washington, Baltimore & Annapolis Electric Railroad Company between Annapolis and Crownsville. The decree further declares that the Annapolis and Elkridge Railroad Company, the predecessor in title of the W., B. & A., acquired only "an easement for railroad purposes" which was lost "upon the abandonment of the use of said easement for railroad purposes in 1935."

The facts are stipulated or undisputed. The appellees purchased in 1944 a tract of land containing some 108 acres. Their title is derived, through mesne conveyances, from Leonard Iglehart who owned the tract in 1838. In that year a strip across the tract, described by metes and bounds, was condemned by the Annapolis and Elkridge Railroad Company. Thereafter, the Railroad and its successors laid tracks and operated a railroad over them until 1931, and the operation was continued under a receiver until 1935, when the railroad assets were sold to a Bondholders Protective Committee. In 1936, title was transferred to Washington, Baltimore and Annapolis Realty Corporation. On September 11, 1941, title to the strip in question was conveyed to the State Roads Commission for highway use, pursuant to negotiations completed in 1938, but the questions now raised were not brought to an issue until 1957, by a bill for declaratory decree.

The first question presented is as to the extent of the interest acquired in the condemnation proceeding. As the Chancellor stated, if the Railroad acquired an absolute and unconditional fee simple title, that is the end of the case. If it acquired only an easement, further questions are presented as to whether that easement was lost by abandonment and reverter, when the operation of the railroad was discontinued and the rails were removed in 1938, if not before, and, if not, whether the proposed use as a public highway was fairly within the scope of the easement originally acquired for railroad purposes.

The Annapolis and Elkridge Railroad Company was incorporated by Chapter 298, Acts of 1836, passed March 21, 1837. This charter, by reference, conferred upon it the powers contained in Chapter 123, Acts of 1826, passed February 28, 1827, incorporating the Baltimore and Ohio Railroad Company. Section 15 of the B. & O. Charter authorized the company, if it could not agree with the owner of any land wanted for the construction of the railroad for the "purchase or use and occupation of the same," to apply to a justice of the peace who "shall thereupon issue his warrant" to the sheriff to summon a jury to meet on the land to fix the damages. The sheriff was directed to administer an oath, to each juror selected, to "impartially value the damages which the owner * * * will sustain by the use or occupation of the same required by the company", and reduce their inquisition to writing. Section 15 provided that such inquisition "shall describe the property taken, or the bounds of the land condemned, and the quantity or duration of the interest in the same, valued for the company, and such valuation, when paid or tendered * * *, shall entitle the said company to the estate and interest in the same thus valued, as fully as if it had been conveyed by the owner * * * of the same * * *."

It is conceded that the language of the A. & E. Charter validly conferred upon it, by reference, all of the powers granted by section 15 of the B. & O. Charter. It is an historical fact that the construction of the pioneer B. & O. Railroad was a highly favored enterprise, as evidenced by the grant of wide tax exemptions conferred in other sections of its charter. It was contemplated that the Railroad would not only lay tracks for the transportation of freight and passengers but also construct stations, terminals and warehouses. It would have been surprising to find the Legislature limiting its powers to acquire "land, earth, timber, gravel, stone, or other materials, or any improvements which may be wanted for the construction or repair of any of said roads, or of any of their works," as stated in section 15, to mere easements of passage. While the form of oath in section 15 quoted above refers to "the use or occupation of the same required by the company," the jury was directed in the same paragraph to describe in the inquisition "the property taken, or the bounds

of the land condemned, and *the quantity or duration of the interest in the same,* valued for the company". Upon payment or tender, it was declared that the company should become entitled "to the *estate and interest in the same thus valued, as fully as if it had been conveyed by the owner * * *."* (Italics supplied.) We think it is clear that the power granted to the condemner under this section was not confined to the acquisition of mere easements but authorized it, in the exercise of its sound business judgment as to what was necessary or desirable, to acquire complete or fee simple title. Cf. *Ligon v. Potomac Elec. Pow. Co.,* 219 Md. 438, 439, and cases cited.

The record shows that on June 13, 1838, jurors were summoned by a justice of the peace, at the instance of the A. & E. Railroad Co., to meet on the lands of Leonard Iglehart and value the damages, if any, sustained "by the use and occupation of the same required by said Company. * * * as also all other damages the owners thereof shall sustain by construction of the * * * Road in over and through said lands * * *." The jurors declared in their inquisition upon oath that they condemned "so much of the land represented as belonging to the said Leonard Iglehart * * * as of an absolute estate in perpetuity as is contained within the lines of the annexed plat * * *." The valuation found was $2,437.50, for about twenty acres. We may assume that a valuation of about $120 per acre, for undeveloped land in 1837, was a liberal award, even for a complete taking, but the question as to the "quantity or duration of the interest" taken turns, we think, upon the key language in the inquisition describing the taking as "an absolute estate in perpetuity." We think that language can only be construed to describe a "fee simple", or as it is sometimes called, a "fee simple absolute".

In Gavit's Notes on Blackstone's Commentaries, p. 281, the learned author states: "The concept of 'estates' is one dealing with the legally permissible interests in land as measured by a time element. Thus the concept of a fee simple estate is that the owner owns the interests in relation to the property involved from the moment of his original ownership to infinity in the future. In this aspect of it, it is the greatest

estate which one may enjoy in property and is in common language an absolute and unqualified ownership of the interests involved." In 4 Kent's Commentaries (14th ed.), p. 5 it is said that fee simple "is an estate of perpetuity, and confers an unlimited power of alienation, and no person is capable of having a greater estate or interest in land." In 31 C.J.S., *Estates*, § 8, p. 19, it is said that "An estate in fee simple is the greatest estate * * * which a person can possess in landed property, *being an absolute estate in perpetuity.*" (Italics supplied.) The same statement is made in Black's Law Dictionary (2d ed.), p. 487. These definitions have been quoted in cases too numerous to mention. While it is true that the words "in perpetuity", standing alone, might not be controlling, since they may be used to describe the duration of a lesser estate, Cf. *Taylor v. Baltimore,* 45 Md. 576, 578, we think the phrase "absolute estate in perpetuity" is synonymous with "fee simple absolute". In *Water Power Co. v. Street Railroad Co.,* 172 U. S. 475, 491, the Supreme Court said: "*In construing statutes words are taken in their ordinary sense.* [The meaning of] the word 'absolute' * * * [in] [i]ts most ordinary signification is 'unrestricted' or 'unconditional.' Thus, an absolute estate in land is an estate in fee simple." Cf. *Barnett v. Barnett,* 117 Md. 265, 268.

Any lingering doubts as to the correctness of this construction are resolved, we think by the Maryland case of *Bond v. Murray,* 118 Md. 445. In that case this Court dealt with questions raised in an ejectment case brought by surviving trustees of the Chesapeake and Ohio Canal Company against the occupier of property in Cumberland acquired by the Canal Company in a condemnation proceeding in 1837. Section 15 of its charter (chapter 79, Acts of 1824) contained essentially the same provisions as the B. & O. Charter. The sheriff's jury was directed "to describe and ascertain the bounds of the land by them valued, and the quantity and duration of the interest and estate in the same, required by the said company for its use; * * * and on payment * * * the said company shall be seized of such land as of an absolute estate in perpetuity, or with such less quantity and duration of interest or estate in the same; or subject to such partial or

temporary appropriation, use or occupation as shall be required and described as aforesaid, as if conveyed by the owner of them; * * *." A judgment for the defendants was reversed, and a new trial awarded, because of error in the action of the lower court in overruling the plaintiffs' demurrer to a plea on equitable grounds. That plea set up claims of adverse possession, which the court held could be shown under the general issue plea, if sustainable at all in view of the language of a later statute, and abandonment. The court noted (p. 452) that "The plea admits the title of the Chesapeake and Ohio Canal Company to the land in controversy, and that it was acquired by virtue of certain condemnation proceedings, as asserted in the declaration." The record in the case shows that the inquisition valued the land and damages at $250, "said land so valued and described * * * being required by the said Company for its use as an absolute estate in perpetuity * * *." The court said (p. 453): "It seems to be clear, then, that under the charter of the Canal Company, and the several Acts passed subsequent thereto, that the Canal Company holds a fee simple title to the lands by virtue of the condemnation under the Act, and are seized of the lands so taken as 'an absolute estate in perpetuity.' "

The appellees argue that there was no controversy about the title and that the court's remark was not even a *dictum*, but the statement of a conceded fact. It is true that the issue of fee simple *vel non* was not directly presented or discussed in the opinion, but there is a discussion in the appellant's brief of the point that the claim of abandonment, asserted in the plea on equitable grounds, could not be sustained because the Canal Company acquired a fee simple title and not a mere easement. Hence, the court's statement was germane, and may well have been intended, as in the discussion of adverse possession, to guide the trial court upon retrial of the case. If that was the purpose, the statement can hardly be regarded as *dictum*. The question of title was put in issue by the general issue plea. The court did not state its conclusion as a *concessum*, but on the contrary, the statement indicates that the judicial mind was directed to the *quantum* of title to be ascribed to the phrase "absolute estate in perpetuity". We

are informed that on remand, the trial court granted a pre-emptory instruction incorporating the language quoted. There was no further appeal.

There can be little question but that at or about the time of the adoption of the charter of the C. & O. Canal Co., the phrase "absolute estate in perpetuity" was in general use to describe a fee simple absolute, as distinguished from a terminable fee or easement.  See 2 Lewis, *Eminent Domain*, (3d ed.), § 450, citing *Haldeman v. Pennsylvania R. R. Co.,* 50 Pa. St. 425, 430, 437, and *Wyoming Coal & Transportation Co. v. Price,* 81 Pa. St. 156, 173.  In these cases it was squarely held that under canal charters adopted in 1826, containing the phrase in question, the condemners acquired a fee simple title that did not lapse through misuse.

The appellees rely strongly upon the case of *Hamilton v. Railroad Co.,* 1 Md. 553.  In that case the company had condemned a certain parcel of land in 1838, upon which it had erected a station subsequently used in part as a tavern.  The questions posed were whether the complainant, claiming title under the condemnee, was entitled to the building because the land on which it stood was not necessary for the purposes of the Company, and, if not, whether he was entitled to an injunction to prevent the use of the building as a tavern.  The court held that the building was reasonably necessary for the accommodation of passengers.  The court said (p. 567) : "But it is contended, that admitting the land was properly condemned, and the house was erected for a legitimate purpose, it has been, and still is, used as a tavern, in which spirituous liquors are sold; which is such an illegitimate and improper use of the building, that the company have forfeited all right to the same, and the land, with the house, have reverted to the complainant, as the owner of the fee-simple title; the company under the condemnation, having acquired nothing more than a right to the land, for the legitimate, necessary purposes of their road; which gave them simply an easement."  We think it is obvious that the statement last quoted was merely the contention of counsel, and not a holding by the court.  Indeed, the court went on to say that it would not follow that there was a forfeiture or abandonment,

even "If it be admitted, that the relative rights of the parties in regard to title, under the inquisition, are as here stated". It requires no citation of authority that a point assumed by the court, as immaterial to the decision of the case, is not a decision or holding.

The appellees further contend that the court's statement (p. 569) that "The occupation of the house in part as a tavern, does not deprive him of the land on which it stands" recognized that the complainant held title. Here again, the context makes it clear that the court was merely assuming, without deciding, the correctness of the complainant's contention. The paragraph starts with the statement "Assuming the correctness of the position * * *." Denial of an injunction was affirmed on the ground that "He has not shown any special injury or damage to himself."

The appellees also rely upon the case of *Hodges v. Owings,* 178 Md. 300. In that case there was a conveyance to a railroad company in consideration that it "do locate its Railroad through, in and upon lands owned by" the grantor, and in further consideration of one dollar. The deed conveyed a strip sixty-six feet wide, "together with the right to divert streams of water for Railroad purposes, and to take and use any stone or timber or other material within the limits of said strip of land as said Railroad is now located." The deed also released all damages that "may or might accrue * * * for or by reason of the appropriation and occupancy of said strip of land * * * for use of said Railroad". The court construed the grant as an "easement for railway purposes and use only". It was pointed out that if there had been an intention to convey a fee, the grant of the land would have carried with it the right to use materials found on the strip, "without leave or license from the grantor or any one else". The conveyance was said to be "a gift of this piece of right of way". There was no language in the deed comparable to the expression "absolute estate in perpetuity" found in the condemnation in the instant case. We think the case is readily distinguishable.

Some of the commentators on the subject take the view that where a condemnation is for the purpose of a railroad

right of way there is a presumption that the grant is limited to that use.  See 3 Nichols, *Eminent Domain* (3d Ed.), § 11.1; 3 Tiffany, *Real Property* (3d Ed.) § 772; and Clark, *Covenants and Interests Running with Land,* p. 65.  Many cases are collected in an exhaustive note in 132 A. L. R. 142, where the commentator attempts to reconcile the apparent conflict in the cases on the basis of whether the grant is in terms of land or a mere right of way.  In the instant case we think any presumption arising from the general purpose of the acquistion is overcome by the facts that there was no limitation imposed by the Charter, the condemnation award did not contain the language sometimes found in the cases, "for railroad purposes only", and the land taken was described by metes and bounds and not as a right of way.  Cf. *Richfield Oil Corp. v. Chesapeake & Curtis Bay Railroad Co.,* 179 Md. 560, 569-572, construing "rights of way for railroad purposes" as conveying an easement under the circumstances, and *Potomac Edison Co. v. Routzahn,* 192 Md. 449, 453, where there was an express reverter clause of a right of way, in the event that the railroad use was discontinued.  Finally, we think the reference to the quantity and duration of the interest taken "as of an absolute estate in perpetuity" effectually negatives an intention to limit the taking to an easement.

Since we hold that the Annapolis and Elkridge Railroad Company acquired an absolute fee simple title to the property in question, it is unnecessary to discuss the other questions argued.  It is not contended that such a title would be divested, by reverter, upon conveyance to a third party, even for purposes other than the operation of a railroad.

*Decree reversed and case remanded for the passage of a decree declaring that the appellant is vested with fee simple title to the strip in question, costs to be paid by the appellees.*