## SMITH *v.* WASHINGTON, ET AL. TRUSTEES OF THE UNION METHODIST CHURCH

[No. 10, September Term, 1966.]

---

2. The word "provision" appears in the Act. The word "division" has been substituted in the Code.

302

*Decided February 8, 1967.*

*Motion for reargument filed on March 9, 1967, denied on March 14, 1967.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, OPPENHEIMER, McWILLIAMS and FINAN, JJ.

*Austin P. Frum,* with whom were *Thomas S. Jackson* and
*Thomas Elmo Jones* on the brief, for appellant.

*William I. Gosnell* for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

Both parties claim to own a small (0.439 acres)[1] lot in Up-
per Marlboro fronting 360 feet on the Washington-Marlboro
Pike. The trial court declared the appellees, whom we shall call
the Trustees, to be vested with title. Appellant (Smith) con-
tends here, as he did below, that the evidence was insufficient
to support the Trustees' record title and that, in any event, he
and his predecessors have acquired title by adverse possession.
We think the decision of the trial judge was correct.

We shall discuss first the muniments of title on which the
Trustees depend. In January 1845 Edward J. K. Scott and his
wife conveyed the lot (herein called the church lot) to Ben-
jamin Duvall and eight others, "in trust to build or cause or
allow to be built thereon a house or place of worship for the
use of the Methodist Episcopal Church in the United States of
America according to the rule and discipline" from time to time
in force and effect. Vacancies caused by death or apostasy were
to be filled by the remaining trustees upon the call of the min-
ister "in order to keep up the number of nine trustees forever."
The stated consideration was $100.

---

1. Originally about ¾ of an acre. A part of the lot was taken
for the widening of the Marlboro Pike.

The trustees built a church on the lot but they never bothered to fill the vacancies created in their number by death. Little by little their number diminished until there came a day when there were no trustees. In 1898, "many years" after the death of the last survivor, the presiding minister called a meeting of the congregation to appoint successor trustees. On 21 March 1898 Frank Pinkney and eight others were named. Their appointment later was confirmed by a General Quarterly Conference of the church. However, there must have been some skeptics in the congregation because later on a bill in equity seeking the confirmation of the new trustees was filed in the Circuit Court against the heirs of the original grantor, Edward J. K. Scott. The following excerpts from the opinion of the trial judge (Merrick, J.) are informative:

> "This cause being ready for hearing and being submitted upon Bill, testimony and answers of the minor children by their guardian ad litem."

> \* \* \*

> "It appears from the testimony that a church was built on said lot as required by and for the purposes of the trust, and therein for a number of years religious services were held according to the ritual and discipline of the beneficiary church. \* \* \* and it appearing to the Court that the election of said Trustees as set out in the proceedings and proof in this cause, was in conformity with the ritual and discipline of said church, and each of them having assented to act as trustee and it appearing that the plaintiffs are entitled to relief in the premises.

> "It is therefore adjudged, ordered, and decreed by the Circuit Court for Prince George's County, sitting in Equity this 26th day of January, 1899 that Frank Pinkney \* \* \* [and eight others] are hereby nominated, appointed, or confirmed, as trustees of the Methodist Episcopal church of the United States in America, to succeed the first named nine trustees set forth in the before recited deed in trust of Edward J. K. Scott and wife to Benjamin Duvall and others, dated November 24, 1845 \* \* \* and that the title to the said

three quarter acres of land is hereby decreed to be vested in them and their successors in office, upon the like trusts for the same uses and with similar powers as are declared in the deed of Edward J. K. Scott aforesaid."

Another half century later, William Howard Washington and eight others, the third group of trustees (styling themselves Trustees of Marlboro Methodist Church, now known as Union [Memorial] Methodist Church [Upper Marlboro]), filed a bill for the specific performance of a contract to sell the church lot to Addison H. Ford, a member of the church, for $5000. Ford in his answer, after admitting that the complainants were properly constituted trustees, expressed his willingness to purchase the property if he could be assured that the title was "good and merchantable." He alleged a break in the chain of title. The Land Records, he charged, revealed no connection between the present Trustees and the nine original trustees named in the 1845 deed. Evidence in support of the allegations of the bill of complaint was produced and on 28 April 1959 Judge Fletcher decreed the specific performance of the contract. Ten days later Ford conveyed the lot to Union Memorial Methodist Church (Upper Marlboro), a Maryland corporation.

Before turning to the muniments of Smith's claim of title it should be noted that Joseph S. Wilson and his wife by a deed dated 5 September 1899 conveyed to the Vestry of Trinity Church in Prince George's County a 12.5 acre lot adjoining the church lot to the west. The church lot is characterized in the Vestry's deed as having been "formerly occupied by a Methodist Church." Since the church lot now lay between the Vestry's lot and the Marlboro Pike the Vestry undertook to acquire it and their efforts in that direction resulted in the deed which is the beginning of Smith's title.

By a deed dated 29 June 1900 Charles W. Randall and four others, describing themselves as "Trustees for the Methodist Episcopal Church *South* (herein called the South Trustees), conveyed the church lot to the Vestry "in consideration of the sum of fifty Dollars" and the further consideration that the Vestry and its successors "will not cultivate or allow to be cul-

tivated the property * * * *but will keep the same as a grave-yard as at present."* (Both emphases supplied.)

In 1947 the Vestry conveyed a part (6.88 acres) of the 12.5 acre tract *and* the church lot to Henry B. Clagett. It is worth noting that when the surveyor came to the church lot in the course of his description of the 6.88 acre part he identified the boundary between the church lot and the Vestry lot as follows, "thence with the lines of a cemetery * * *."

In July 1953 the heirs of Henry B. Clagett conveyed the Vestry lot (6.88 acres) and the church lot to Gus Basiliko and wife. Two weeks later the Basilikos transferred both lots to Gale Realty Corp. Smith's deed from Gale Realty Corp. is dated 7 March 1956.

What happened to the church that was built on the church lot we do not know. We do know, however, that some time around the turn of the century services were continued at another location and are now held at a new church directly across the Marlboro Pike. In 1957, the Reverend Mr. John L. Winters, who was in his seventh year as pastor, received a telephone call from one of his members "that someone was cleaning off" the church lot. He said the attorney for the church instructed him to tell the trespasser "to get off that land immediately." Smith admitted that "the preacher of the church across the street" told him to get off of the church lot.

### I.

Smith insists that in the 1898-1899 equity case the Trustees did not prove that they were the "duly elected successors of the trustees named in the 1845 deed." It is certainly true that they were not elected in the manner and at the times stated in the 1845 deed. It does not follow, however, that their election was a nullity. Indeed, the manner of their election was specifically authorized by Chap. 388 of the Laws of Maryland of 1838, the relevant provisions of which are:

"WHEREAS, it has been represented to this General Assembly, that there are within the limits of the State of Maryland, a number of houses of worship, with lots of land used as burying grounds, attached to them, which property is held in trust for such pur-

poses, and doubts and difficulties have arisen, respecting the proper method of perpetuating the said trusts according to the provisions of the deeds whereby they were created, for the purpose therefore of removing such doubts and difficulties, and as it is the design of the act, and the several supplements thereto, of the act to which this is a supplement, to afford the means of perpetuating such trusts:—Therefore,

"SECTION 1. *Be it enacted by the General Assembly of Maryland,* That from and after the passage of this act, whenever any property has been, or shall hereafter be conveyed to trustees, for the use and benefit of any unincorporated church or congregation, which now exists, or may hereafter exist in this State, in order to be used for the purposes of worship and as burying grounds, or for either of these purposes, * * *."

* * *

"Sec. 5. *And be it enacted,* That whenever any property has been conveyed in trust as aforesaid, and by the operations of any cause, or causes whatever, the board of trustees shall have become entirely extinct, it shall and may be lawful for a new board of trustees to be created in such manner as is, or may be prescribed by the discipline and form of church government to which such property belongs, and said board of trustees when so created, shall be seized and possessed of the trust property, and clothed with the same power over it, as if it had been originally conveyed to them by the deed creating the trust aforesaid."

* * *

"Sec. 7. *And be it enacted,* That the provisions of this act shall not extend to any other than the Methodist Episcopal Church property, so held in trust as herein described."

Judge Merrick found as a fact that the election of the Trustees "was in conformity with the ritual and discipline" of the church

and, since the requirements of the statute appear to have been met, we think the trustees named in Judge Merrick's opinion were de jure successors of the original trustees.

Smith argues that Judge Merrick's decree is ineffective because his predecessors were not made parties to the proceeding. To demonstrate how little merit there is in this argument one needs only to point out that the deed from the South Trustees to the Vestry is dated 29 June 1900, five months *after* Judge Merrick declared Frank Pinkney et al. to be the successors of the 1845 trustees. There is nothing to show that Pinkney and his fellow trustees knew of the existence of the South Trustees and, we might add, the record is mute as to how they (the South Trustees) claim to be the successors of the 1845 trustees.

The Trustees named in the 1959 specific performance proceeding alleged they were duly appointed. The defendant, in his answer, admitted they were duly appointed. The testimony supports that allegation together with the fact that their appointment was confirmed by the Quarterly Conference. We think the Trustees named in the 1959 case were also de jure successors of the 1845 trustees. While the corporation (Union Memorial Methodist Church, Upper Marlboro) is now vested with the title to the church lot it is of some interest that six of its trustees (named in the case at bar) were also parties to the 1959 proceedings.

Smith attaches great importance to the fact that, in the past, we have held conveyances to trustees for the use of the Methodist Episcopal Church to be void because the designation of the beneficiaries named therein has been too vague and indefinite. He cites *Baltimore Life Ins. Co. v. M. E. Church,* 148 Md. 603, 129 Atl. 908 (1925) and the earlier cases therein mentioned. However, there is a well established exception to the general principle stated in those cases. In *Trustees etc. v. Jackson Sq. Church,* 84 Md. 173, 35 Atl. 8 (1896), the Lessors, by a 99 year lease made in December 1866, in consideration of an annual rent of $280, conveyed to eight trustees and their successors real property in Baltimore, upon the following trust:

" 'In trust that the said premises shall be used, kept, maintained and disposed of as a place of divine worship for the use of the white ministry and white mem-

bership of the Methodist Episcopal Church in the United States of America, subject to the usages and ministerial appointments of said church as from time to time authorized and declared by the General Conference of said church and the Annual Conference in whose bounds the said premises are situate.' " *Id.* at 176.

Judge Briscoe, who spoke for the Court, said:

"Now it is very clear, that the trust expressed and contained in the lease from Johnson *et al.* to Pentz *et al.* is void and must fail. In *Isaac et al., Trustees, v. Emory et al.,* 64 Md. 337, it was held, in construing a similar trust, that 'this designation of beneficiaries is too vague and indefinite to be sustained by the Courts. According to the uniform course of decisions in this State, a trust cannot be upheld unless it be of such a nature that the *cestuis que trust* are defined and capable of enforcing its execution by proceedings in a Court of Chancery. *Church Extension of M. E. Church v. Smith,* 56 Md. 397.'

"But while the trust is void, it does not follow that the lessees failed to acquire any title or that there was a resulting trust in favor of the lessors. The lease was not a voluntary conveyance but was made upon a valuable consideration, the payment of the annual rent of $280. *When there is a consideration for the conveyance and it is made upon a trust which is void for uncertainty or otherwise fails, then the grantee takes the beneficial interest.* 2 *Pomeroy Eq.* 1033; *Perry on Trusts,* sec. 151. A resulting trust will not be raised in opposition to the obvious design of the transaction. *Perry on Trusts,* sec. 159; *Walsh v. McBride et al.,* 72 Md. 45. *In the case now under consideration the trust appears to have been set forth in the lease only to show the purpose for which the property was bought and not to limit the right of alienation. Newbold v. Glenn,* 67 Md. 491. The lease consequently is valid and the lessees took the same free from the trust therein set forth." *Id.* at 177-78. (Emphasis supplied.)

Our holding in *Trustees v. Jackson Sq. Church, supra,* was cited with approval in *Rosenthal v. Miller,* 148 Md. 226, 231, 129 Atl. 28 (1925) and in *Schwarz v. United States,* 191 F. 2d 618, 621 (1951).

We must now consider whether the $100 paid for the church lot in 1845 was a "valuable consideration." The answer is within easy reach. It will be recalled that the Vestry bought the 12.5 acres adjoining the church lot to the west in 1899, more than a half century later. The consideration was $1200 or something less than $100 per acre. In *State Roads Commission v. Johnson,* 222 Md. 493, 497, 161 A. 2d 444 (1960) we assumed that $120 per acre was a "liberal award" for undeveloped land in Anne Arundel County in 1837.

It cannot be supposed, in the circumstances, that the 1845 deed was anything but a transaction negotiated at arm's length for a "valuable consideration" and that the only reason for the grant in trust was "to show the purpose for which the property was bought and not to limit the right of alienation." *Trustees etc. v. Jackson Sq. Church, supra.* The church was built and for many years the services held there conformed to the ritual and discipline of the Methodist Episcopal Church and it appears that, for many years, a part of the lot was used to bury the deceased members of the congregation. The church has continued its activities, without interruption and is now housed in a new church on the other side of the road. The heirs of the original grantors, in 1898, were brought into court in person, by publication and by guardian *ad litem* to assert their claims, if any they had. The court three times has confirmed the title of the Trustees. All things considered, we cannot say that there is insufficient competent evidence to support Judge Powers' finding that the appellees established good record title. Maryland Rule 886 a.

## II.

Rather than discuss in detail Smith's contention that he and his predecessors have acquired title by adverse possession we shall repeat pertinent extracts from the opinion of Judge Powers:

"Thus we turn to the next question, as to whether the defendants have made out a case of adverse posses-

sion. Defendant's witness Edmond Shrewsbury, the son of the then Rector of Trinity Church, lived at the Rectory except when away at school from 1926 to 1947. During that time some tobacco was raised on the Rectory property but some old grave markers on the land in question 'prohibited' them from farming that part. During the period of 21 years he 'cleaned up' the land 8 or 10 times, but no one else 'cleaned up' during that time that he knew of. He said the rectory property was enclosed by a fence, including the land in question.

"Lansdale G. Sasscer, Sr., who remembered the property for 50 years, testified that the entire rectory property, including that acquired in 1900, was fenced in, that there were neglected tombstones on this land and he was not sure that any were standing.

"Leroy Pumphrey had a 'hazy recollection' of a Church once being on the site and thereafter he knew of no use being made of the property as it was 'sort of held holy and sacred'.

"The defendant since acquiring a deed to the entire tract in 1956 has had a 4 ft. x 7 ft. 'For Sale' sign on the property, and State and County taxes have been paid on the property since 1947. Prior thereto the property apparently was not on the Assessor's rolls."

\* \* \*

"Three elderly members of the Church for which the plaintiffs are Trustees testified as to familiarity with the property and all stated they had never seen anyone 'make use' of the land. One of these, now eighty-seven years of age, belonged to the Church for seventy-two years and has known the land since then.

"There is evidence that the fence on the road side of the property was removed, apparently in connection with a widening of the road, and that this was some time prior to the time that the Shrewsburys left in 1947. Whenever this occurred there, of course, ceased to be an enclosure of the questioned land.

"Also there is evidence that there was a fence on

the back line of the questioned property which would lessen the effect of the fence enclosing all the property.

"There is no evidence as to who built the original fence and the circumstances surrounding this construction. I am not convinced from the evidence that the defendant proved that acts of ownership were exercised by the predecessors under which he claimed title, which were public and notorious, and calculated to notify the plaintiffs and those under whom they claimed of a hostile invasion of their rights. *Sadtler v. Peabody Heights Co.*, 66 Md. 1, pages 5-6. I conclude as to the adverse possession issue that the defendant and his predecessors have not occupied the disputed land to a degree or for a time sufficient to give them title."

Our examination of the evidence has satisfied us that the conclusion reached by Judge Powers in respect of Smith's claim of adverse possession is not clearly erroneous. Maryland Rule 886 a.

### III.

In his decree Judge Powers declared the title to the church lot "to be vested in such Trustees and their successors in office, upon the like * * * [trusts] for the same uses and with similar powers as are declared" in the 1845 deed, "free, clear and discharged from the claims of all parties" to the proceeding. We shall affirm Judge Powers' decree; however, the Trustees should be mindful of the conflict which will exist between the decree which vests title in the Trustees and the Land Records which show title to be in the corporation. The congregation might find it advisable to rectify this untidy situation by having the Trustees quitclaim all of their right, title, interest and estate in the church lot to the corporation.

*Decree affirmed.*
*Costs to be paid by appellant.*