575 A.2d 1249

**Philip V. MICELI**

v.

**Robert FOLEY, et al.**

**No. 1170, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

July 2, 1990.

542

Douglas L. Burgess (Nolan, Plumhoff & Williams, Chartered), Towson, for appellant.

Robert R. Bowie, Jr. (White, Mindel, Clarke & Hill, on the brief), Towson, for appellee, Foley.

Roger L. Elliott, Towson, for appellees, the Millers and the Bronzerts.

Argued before BISHOP, BLOOM and ROBERT M. BELL, JJ.

BISHOP, Judge.

Appellant, Philip V. Miceli, the owner of a parcel of land in Glen Arm, Maryland, filed a complaint against all interested neighbors to protect his claim to land along the southwestern and northwestern borders of his property.[1] The landowners along the southwestern boundary (hereinafter referred to as the Dollenberg Strip [2]), appellees here, were Robert and Jean Foley and Melvin and Lorriane Bronzert. Property owners along the northwestern boundary (hereinafter referred to as the abandoned railroad right of way) include appellees Richard J. and Gail G. Watson, Kenneth Fowler, Exterior Design, Inc., Mildred Liersmann, Charles and Mary Miller, Ruth and Dewey Beitler [3] and Melvin and Lorraine Bronzert. Miceli's complaint alleged counts of ejectment, trespass, quiet title, and adverse possession. Appellees challenged these counts and asserted claim to the property based on adverse possession.

1. Miceli's complaint against James B. Lyons, III, Joseph B. Lyons, and Lyons and Lyons Lawn Service was settled and a Consent Order was entered.

2. This area is referred to by the parties as the Dollenberg Strip because it was created when a surveyor, Dollenberg, improperly marked the division between the two parcels.

3. Miceli's initital complaint named Ruth Wright as defendant. Prior to trial the complaint was amended to correct her name to Ruth Beitler, and her husband, Dewey Beitler, was added as a defendant.

This case is an appeal from the Circuit Court for Baltimore County (Fader, J.) which found that "[a]s a matter of title, survey and boundary law" the Dollenberg Strip was "vested" in Miceli; however, the court denied Miceli's claim to quiet title and adverse possession, ejectment and trespass to the Dollenberg strip and ruled that defendants and counter-plaintiffs Bronzert and Foley had obtained the land by adverse possession. With respect to the railroad right of way, the court held that Miceli had no title to the land and found that Liersmann, Miller, Beitler, and Bronzert acquired fee simple title by means of adverse possession to the parts of the railroad adjacent to their properties. Watson and Fowler's claim for adverse possession was denied.

## ISSUES

Miceli asks this Court:

I. Whether the circuit court erred in ruling that Foley and Bronzert were the owners of the Dollenberg Strip by adverse possession;

II. Whether the circuit court erred in ruling that Liersmann, Beitler, Miller and Bronzert were owners of the former railroad property by adverse possession;

III. Whether the circuit court erred in ruling that Miceli was not the record owner of the former railroad right of way.

## FACTS [4]

On May 31, 1960, planning to expand his tool company, Philip V. Miceli [5] purchased from Charles and Viola Eck a rectangular, unimproved parcel of land in Glen Arm, Maryland. Included in the deed to this parcel was the right to

---

4. For a more comprehensive and consolidated view of both properties see the appendix which the trial judge made part of his ruling.

5. Both parcels were purchased by Philip V. Miceli and his wife Doris May Miceli as tenants by the entireties. Doris May died on October 5, 1985 and the properties passed by operation of law to Philip, individually.

use, with others entitled thereto, a twelve foot right of way which served as the only access to a public road. A year and a half later, on January 29, 1962, Miceli purchased a contiguous strip of land immediately adjacent to his first parcel from the Maryland and Pennsylvania Railroad Company. This 1.5 acre strip is commonly referred to as the old Maryland and Pennsylvania Railroad right of way.

The appeal *sub judice* concerns boundary disputes along the northwestern and southwestern borders of Miceli's land. The first contested boundary, a fifty-foot wide area referred to by the parties as the Dollenberg Strip, runs along the entire length of the southwestern border. The northwestern boundary is comprised of the former railroad right of way. This parcel varies in width from thirty to forty feet. We will first examine the dispute concerning the southwestern boundary, the Dollenberg Strip, and then we will turn to the claims to land along the northwestern boundary, the railroad right of way.

## I. *Southwestern Boundary: The Dollenberg Strip*

The testimony traced title in this land back to a 116 acre parcel owned by George and Georgie Issennock who acquired it by deed on December 18, 1917. The Issennocks subsequently conveyed two portions of it. The first 38.5 acres was initially conveyed on August 14, 1923 to William and Louise Piper and eventually to Philip V. and Doris M. Miceli by Deed from Charles Eck and wife on May 31, 1960.

Nearly twenty years after the deed to the Pipers, the Issennocks conveyed an adjacent parcel containing 57.36 acres to Robert S. Durling, et ux. On May 18, 1950 Durling conveyed this land to Louvan and Violet Wood. Wood conveyed the northwestern parcel to appellee Bronzert. On March 15, 1971 and August 24, 1971, Wood conveyed a second parcel from the southwestern part of the property to appellee Foley. The deed transactions for these parcels of land may be summarized as follows:

ISSENNOCK, (circa 1917)
(Owner of 104 Acres)
Subsequent subdivision and sales

ISSENNOCK (circa 1923)
Sale of 38.5 acres

PIPER
(Owner from 1923-44)

WEBER
(Owner from 1944-46)

LANG
(Owner from 1946-49)

ECK
(Owner from 1949-60)

MICELI
(Owner from 1960-present)
38.5 acres

ISSENNOCK (circa 1942)
Sale of 57 acres

DURLING
(Owner of 57 acres from 1942-50)
Sale of 23 acres
(Other acreage not relevant)

WOOD
(Owner of 57 acres from 1950-71)
Sale of two parcels of land
(Other parcels not relevant)

8 acres 3 acres

FOLEY BRONZERT
(Both have been owners from 1971-present)

The present conflict concerning the boundary between Miceli's parcel and the Bronzert/Foley parcels can be traced to Issennock's first conveyance to Piper. The metes and bounds description in this deed conflicts with the metes and bounds description in the deeds subsequently transferred by Issennock. The following diagram [6] reflects this conflict. Bronzert and Foley claim title to the line represented by a crossed line in the diagram whereas Miceli contends that his property line extends to the line represented by dashes.

---

6. The diagram is not to scale.

**550**

After reviewing the testimony of land surveyors and title experts the court found that Miceli was the record owner of the land to which Foley and Bronzert claimed title. Foley and Bronzert contended that they had occupied this land adversely for the requisite statutory period and, therefore, title was theirs by operation of law.

In support of their claims to title, Foley and Bronzert produced evidence that a fence which had been erected between the Issennock and Piper properties, at the time of the initial division of the Issennock property, represented the metes and bounds of land use since 1923.

Leo J. Elwood, Issennock's son-in-law, who lived on the "Old Issennock" property since 1932, testified that he was "on the property" when Issennock sold a portion of the land to Durling. Issennock used the land to graze cattle, and Piper farmed it. He stated that the fence was erected in 1923 "at the latest" and that some posts and wire from the original fence were still in place at the time of trial.

Another witness, Harry K. Elwood, testified that a fence divided the Wood (Issennock's successor in title) and Eck (Piper's successor in title) parcels. Wood cleared and mowed the land up to the Eck border. Wood gathered

firewood and his children played in the trees up to the fence.

Appellee Foley confirmed that there was a fence between the two properties during his period of possession. In 1972 he constructed an additional fence a few feet inside the old one. He placed "no trespassing" signs along the Dollenberg Strip on two occasions. His children used the area as a playground.

Appellee Bronzert stated that he had lived in the area since 1965. In 1971 he purchased Louvan Wood's property which was adjacent to the land Bronzert owned north of the right of way. At the time Bronzert purchased the property a fence ran down the eastern property line. In March, 1971 Bronzert constructed a new fence in front of the old one and erected two sheds.[7] He also added a "power pole" to bring energy to the sheds. In 1965 he observed the previous occupant, Dennis Cahill,[8] manually clearing the land and using the property on weekends. Cahill would camp on the property "right up against the fence line." Bronzert stated that in 1965 all of the Wood property (including the land eventually purchased by Foley) was cleared and planted with pine trees. Wood treated the entire area up to the fence as his own. Bronzert testified: "He maintained it, cut it, cut underbrush."

At the close of the evidence the trial judge found that Foley and Bronzert adversely possessed the land for the requisite twenty-year period. He found that Foley's testimony demonstrated that since 1971 he had assumed the requisite dominion and control over the property. Though he found that adverse use of the land prior to 1971 less clear cut, he found that the land had been possessed adversely and continuously since the initial Issennock convey-

---

7. We cannot tell from the record whether these sheds were constructed on the Dollenberg Strip.

8. Bronzert testified that Cahill purchased the property from Wood and began to clear the land to build a house. Because he was unable to build a driveway, he sold it back to Wood.

ances. This period of use was tacked to appellees' use since 1971 to create adverse use for more than the requisite statutory period. The court stated *inter alia:*

... I believe that by preponderance of the evidence, more likely true than not true, more likely so than not so, at least 51 percent, certainly not to a mathematical certainty, that the adverse possession has existed since 1923.

By applying the principle of tacking the court concluded that Foley demonstrated that "his occupation of the land has been actual, hostile, notorious, and exclusive under a claim of title and continuous or uninterrupted use for a 20 year period of time."

The court was convinced that Bronzert took possession of the property in 1971 and under the principle of tacking claimed dominion and control over the land for the requisite period. We will provide additional facts where necessary in our discussion of the issues.

## DISCUSSION

### I. *Adverse Possession of the Dollenberg Strip*

 To establish title by adverse possession a claimant must show possession of the property for twenty years. The land must be continually possessed in an actual, open, notorious, exclusive and hostile manner, under claim of title or ownership. Md. Courts and Judicial Proceedings Code Ann. § 5–103(a) (1989 Repl.Vol.); *Costello v. Staubitz,* 300 Md. 60, 67, 475 A.2d 1185, *on remand, Peters v. Staubitz,* 64 Md.App. 639, 644–645, 498 A.2d 661 (1984); *Miklasz v. G.W. Stone, Inc.,* 60 Md.App. 438, 443, 483 A.2d 382, *cert. denied,* 302 Md. 570, 489 A.2d 1129 (1984); *Wilt v. Wilt,* 242 Md. 129, 135, 218 A.2d 180 (1966); *East Wash. Railway v. Brooke,* 244 Md. 287, 294–295, 223 A.2d 599 (1966). The burden of proving title by adverse possession is on the claimant. *Costello v. Staubitz,* 300 Md. 60, 67, 475 A.2d 1185 (1984). A court's determination of whether land is possessed adversely should be based on the possessor's objective manifestation of adverse use and not on his or her

subjective intent. *Miklasz, supra* 60 Md.App. at 443, 483 A.2d 382. "[I]n determining whether the claimant's acts of dominion constitute adverse possession, the court is to consider the character of the land and the uses and purposes to which it is adapted because 'the type of possessory acts necessary to constitute actual possession in one case may not be essential in another.' " *Peters, supra* 64 Md. App. at 645, 498 A.2d 661, *quoting Blickenstaff v. Bromley*, 243 Md. 164, 171, 220 A.2d 558 (1966). *Accord Goen v. Sansbury*, 219 Md. 289, 296, 149 A.2d 17 (1959).

### A. The Costello Test

Relying on *Costello v. Staubitz*, 300 Md. 60, 475 A.2d 1185 (1984), Miceli asserts that because there was insufficient evidence that Foley's and Bronzert's predecessors intended to claim the land adversely up to the fence, the trial court's ruling should be reversed.

■ In *Costello v. Staubitz, supra,* the Court of Appeals discussed the appropriate inferences to be drawn from the existence of a visible line of demarcation when determining a claim of adverse possession. A determination of the significance of a boundary marked by a fence is dependent upon who erected it and the purpose for which it was erected. *Id.* at 69, 71, 72, 475 A.2d 1185. The Court elucidated general principles to be applied in such cases:

1) The existence of a visible line of demarcation ordinarily does not constitute evidence of adverse possession when:

a) it was created by a record owner, for the record owner's land, *Storr* [*v. James* ], 84 Md. [282] at 290–91, 35 A. [965] at 967 [ (1896) ]; or

b) it was created by a party claiming title by adverse possession for the purpose of claiming the visible line of demarcation as a boundary only if it is in fact coincident with the actual boundary, [*Miller v.*] *Tamburo*, 203 Md. [329] at 336, 100 A.2d [818] at 821 [ (1953) ].

2) The existence of a visible line of demarcation ordinarily constitutes some evidence of adverse possession when:

a) it was created by a party claiming title by adverse possession for the purpose of claiming the visible line of demarcation as a visible boundary delineating the extent of the claimed adverse possession, *Tamburo*, 203 Md. at 336, 100 A.2d at 821; or

b) there is no evidence to show by whom and for what purpose the line of demarcation was created, *Ridgely* [*v. Lewis*], 204 Md. [563] at 566–67, 105 A.2d [212] at 212–13 [ (1954)].

*Id.* 300 Md. at 73, 475 A.2d 1185. The Court continued to explain:

The only evidence presented relating to the fence was that it was erected by a farmer who was the record owners' predecessor in interest. The farmer's sole purpose for erecting the fence was to confine his cattle to his own property, lot 233, and to prevent them from straying onto the adjoining property, lot 232. Thus, the record shows that the fence on the disputed property was erected by the record owners' predecessor within the predecessor's own boundaries and for the predecessor's own purposes. Under these circumstances, the existing fence was not a visible boundary delineating the extent of the claimant's adverse possession. It, therefore, did not constitute evidence of adverse possession and was not an appropriate factor to be taken into account in determining the extent of the claimant's adverse possession.

*Id.* at 73–74, 475 A.2d 1185.

 Issennock erected a barbed wire fence in 1923 on Piper's property. This fence ran parallel to his own property, land on which he raised cattle. That fence, the court found as a matter of fact, was used as a demarcation line between the two properties. The court also found that since 1923 all subsequent landowners have considered that line as the demarcation between the two parcels. To some extent the fence still reflects a visible line of demarcation.

In the case *sub judice* the trial court explicitly and properly relied on *Costello's* directives when ruling that adverse possession did exist for the requisite period of time. Consistent with *Costello's* 2(a) the fence was "created by a party claiming title by adverse possession for the purpose of claiming ... a visible boundary." Miceli's suggestion that the court needed to find that Issennock *intended* to take the property adversely at the time he built the fence is untenable. "[T]he fact that the possession is due to inadvertence, ignorance or mistake, is entirely immaterial." *Tamburo v. Miller*, 203 Md. 329, 336, 100 A.2d 818 (1954) *cited* in *Costello, supra* 300 Md. at 71, 475 A.2d 1185.

> The modern trend and the better rule is that where the visible boundaries have existed for the period set forth in the statute of limitations, title will vest in the adverse possessor where there is evidence of unequivocal acts of ownership. In this view it is immaterial that the holder supposed the visible boundary to be correct....

*Costello, supra* at 71, 475 A.2d 1185.

We have reviewed the entire record and find no error in the court's conclusion. Md. Rule 8–131(c); *Rogers v. Burnopp*, 263 Md. 357, 360, 283 A.2d 367 (1971) (Judgment of lower court will not be set aside on the evidence unless clearly erroneous.)

### B. Unequivocal Act of Ownership

Miceli's second contention is that appellees' and their predecessors' uses of the Dollenberg Strip did not constitute "unequivocal acts of ownership." He posits that pursuant to *Costello* such acts must precede a finding of adverse possession. We do not find this argument to be persuasive because it is founded on a misconstruction of the breadth of the *Costello* holding.

■ Judge Davidson writing for the Court acknowledged that as a general rule adverse possession without color of title extends to land actually occupied. However, this rule is relaxed where a visible boundary encompasses all of the claimed land:

[W]here visible boundaries have existed for the statutory period of limitations, if there is evidence of unequivocal acts of ownership, title will vest in the claimant not only to all land actually occupied, but rather to all land delineated by the visible boundary.

*Id.* 300 Md. at 68, 475 A.2d 1185.

■ What constitutes an assertion of possession sufficient to be considered an act of dominion and thus an act of ownership over the land differs on a case by case basis. When determining whether a particular use is sufficient to constitute dominion over the land, a court will consider the character of the land and the purposes to which it is adapted. *See Blickenstaff v. Bromley, supra; Peters v. Staubitz, supra.*

■ During the trial Bronzert and Harry Ellwood, a neighbor, testified that Wood (predecessor in title to both Bronzert and Foley) consistently maintained and mowed the parcel up to the fence line. Elwood also testified that Wood used the land to gather firewood and as a playground for the children. Further, no evidence was produced that such uses are inconsistent with the nature of the residential property or with other uses in the neighborhood. Accordingly, we affirm the court's finding that Foley, Bronzert and their predecessor assumed the requisite dominion and control over the property.

### C. Entry by Third Person

Finally, Miceli asserts that appellees' adverse use along the Dollenberg Strip was interrupted when his surveyor, Allan Evans, and his crew surveyed the land from 1960 to 1962. As a result, he posits, appellees did not possess the land for the statutory period.

■ The running of the statutory period may be interrupted by the owner's entry on the land. This entry must be made with a clearly demonstrated intention to repossess the land. Reentry onto the land must be made openly and under claim of right. 4 Tiffany, *The Law of Real Property*

§ 1161 (3d ed. Callaghan & Co. 1975) cited in *Rosencrantz v. Shields,* 28 Md.App. 379, 388–389, 346 A.2d 237 (1975). "[A]ll authorities agree that entry to have such effect [of interrupting adverse possession] must be an actual entry upon some part of the land within the period of limitations, and must evince that it is made with the clear and unequivocal intent to invade and challenge the right of the holder of the adverse possession and to retake possession." *Rosencrantz, supra* at 388–389, 346 A.2d 237 *quoting Wickes v. Wickes,* 98 Md. 307, 328, 56 A. 1017 (1904).

■■■ Entry sufficient to interrupt an adverse possession need not be accomplished by the owner. A record owner's agent or licensee may also interrupt the running of the statute. An agent's entry must be characterized by a proper assertion of claim to the land. 5 Thompson, *Commentaries on the Modern Law of Real Property* § 2552 at 576–78 (Grimes repl.1957) quoted in *Rosencrantz, supra* 28 Md.App. at 391, 346 A.2d 237. Whether a surveyor's presence on land will interrupt the continuity of adverse possession sufficiently to toll the running of limitations "must necessarily be decided in each case according to the circumstances." *Rosencrantz, supra* at 391, 346 A.2d 237.

■■■ We agree with the reasoning of the Kentucky Supreme court which held that an entry for the purpose of a survey without a claim to the land is insufficient to oust an adverse possessor. *Maysville & B.S.R. Co. v. Holton,* 100 Ky. 665, 39 S.W. 27, at 29 (1897) cited in *Rosencrantz, supra* 28 Md.App. at 392, 346 A.2d 237. In *Maysville* surveys were made on behalf of a railroad which had obtained a right of way by deed. The court concluded:

> The mere walking along the right of way ... and retaking said right of way, were not sufficient to have established a re-entry, as against the continued and actual adverse possession held by appellees and those under whom they claim, or to have broken the continuity of their adverse holding.

*Id.* 39 S.W. at 29. "Before the holder of record title can regain what he has lost ... '[h]e must assert his claim notoriously and openly, or perform some act which will reinstate him in possession.'" *Id.* 28 Md.App. at 392, 346 A.2d 237 *quoting Maysville* 39 S.W. at 29.

 In the case *sub judice* Allan Evans, a surveyor hired by Miceli, testified that he surveyed the property in 1960. He used stakes to determine the division between the two properties, and placed pipes at both corners. Between 1960 and 1962 the surveyor went back three times to re-establish this line because the original stakes had disappeared. During this period he walked most of the property with Miceli. None of his testimony indicated that he accosted an adverse possessor while working for Miceli or that he had made any direct or indirect attempt to oust a possessor of the land. Without difficulty we hold that the surveyor's entry onto the property, the staking and the walking of the property were not sufficient to interrupt appellees' adverse use.

## II. *Northwestern Boundary*

### A. The Former Railroad Right of Way

The Baltimore and Delta Railway Company, predecessor to the Maryland and Pennsylvania Railroad Company, acquired a 3.65 acre strip of land by condemnation from William W. Wilson in September, 1879. The railroad tracks extended across the width of what is now the Miceli property. This land was subsequently conveyed from the railroad to Miceli on January 29, 1962 by a quit-claim deed. Both Miceli and all landowners bordering the railroad claim title to the property. The following diagram (not drawn to scale) clarifies the location of the abandoned right of way with reference to the other parcels:

| BRONZERT | BEITLER | MILLER | LIERSMANN | WATSON | LYONS |
|---|---|---|---|---|---|

ABANDONED MARYLAND AND PENNSYLVANIA RIGHT OF WAY

| BRONZERT | MICELI |
|---|---|

Miceli's claim is based on actual title to the property. In the alternative he claims ownership by adverse possession. He has a quit-claim deed from the railroad and has paid taxes on the property since 1962.

The landowners adjoining this right of way also claim title to the land by adverse possession. All testified that they used the land as their own continually after the railroad ceased use of the strip.

The court concluded that Miceli actually received no ownership rights in the property through the quit-claim deed because the railroad did not own a fee interest in the property. Instead, it found that the railroad owned a right of way and that this easement expired when the railroad abandoned it in 1957. As the railroad had no interest in the property after 1957, Miceli acquired nothing from it through the 1962 deed. The court reasoned that because Miceli had no valid record title to the land, both he and the individual disputants had equal rights adversely to possess the land. After hearing testimony regarding each party's use and control of the land, the court concluded that "under no circumstances has Mr. Miceli come close to having any title by adverse possession. I'm convinced that that is so." Appellees Liersmann, Miller, Beitler and Bronzert were

awarded portions of the right of way by adverse possession. (See Appendix)

### 1. *Liersmann*

Ronald Edward Lynch, Mildred Liersmann's son, testified at trial that he was born on the Liersmann property in 1946. After the railroad pulled up its ties in 1959 they began to use the right of way as their own. They removed railroad ties and stone from the land. The ties were used for building and the stone for fill-in. In addition they have used the right of way for storage of firewood and other materials and they have mowed it. Though they consistently used the land, they never fenced it or paid taxes on it. Lynch also stated that he was away in the army for two years although he did not testify as to the dates.

Miceli argues that this testimony was insufficient to prove that Mildred Liersmann's adverse possession of the land was uninterrupted and continuous for the statutory period. Miceli points specifically to Lynch's two years of military service and suggests that it creates a gap in proof that the property was continually possessed for twenty years. We do not find this argument to be persuasive.

While continuity is an element of adverse possession, what is continuous for purposes of adverse possession depends greatly on the type of land at issue. *See e.g. Bratton v. Hitchens*, 43 Md.App. 348, 357–358, 405 A.2d 333 (1979); *Zimmerman v. Summers*, 24 Md.App. 100, 330 A.2d 722 (1975). In the case at bar Liersmann used the property as a storage area. Though the land may not have been actively used day in and day out, its use for storage remained consistent.

The court specifically found Lynch to be an honest and believable witness. Further, it found that use of the land had been uninterrupted for a period of twenty years. Lynch's testimony that he was in the army for two years does not render these findings clearly erroneous. The court could have inferred, and apparently did infer, that the conditions to which Lynch testified existed before, during

and after his time in the service. There was no evidence to contradict this inference.

## 2. *Miller and Beitler*

Miceli contends that appellees Miller and Beitler did not possess the land adversely for the statutory period because their adverse use was interrupted when he filed suit in October, 1986. We do not agree with Miceli's assertion. Continuity of possession may not be interrupted by the filing of a suit of ejectment without any prior legal interest in the property.

Even if the court had determined that Miceli was the true owner of the right of way, his unsuccessful suit did not interrupt appellees' adverse possession.

> The bringing of an action by the true owner to recover possession, if followed by a judgment in his favor and the recovery of possession thereunder, interrupts the running of the statute, and such interruption occurs, it has been decided, at the time of bringing the action.... *The bringing of an action, however, which results unsuccessfully to plaintiff does not interrupt it.*

4 Tiffany, *The Law of Real Property,* § 1161 (1975 ed.) at 854 (emphasis added.)

Miceli also challenges Miller's and Beitler's adverse uses on the ground that they did not give any public notice in the form of signs, building, or fences that they possessed the property. We find no authority for the proposition that public notice is a necessary element of adverse possession. Possessory acts of dominion over land may be sufficient to charge the record owner with knowledge that the land is adversely possessed. *See e.g. Blickenstaff v. Bromley,* 243 Md. 164, 220 A.2d 558 (1966).

### a. Miller

Charles Eugene Miller testified that he treated the right of way behind his home as a portion of his property since he moved there in June of 1967. With his son he

cleaned garbage off the land and used a briar scythe and mower to care for it. He also cultivated the land planting six dozen pine trees, four blue junipers, four forsythia bushes and six dozen plantings of English Ivy. The lot was used by the entire family as a recreation area.

Miceli contends that this testimony is insufficient to prove that Miller openly, exclusively and notoriously claimed the railroad parcel. We disagree. This testimony was sufficient for the trial judge to find that the Millers possessed the land with the requisite intent. The court found as a matter of fact that Miller's testimony was true. He exercised dominion and control over the land and used it as his own for the requisite amount of time. These rulings are not clearly erroneous.

### b. Beitler

During a pretrial deposition Mrs. Ruth E. Beitler stated that she did not consider the right of way adjoining her land to be her own and that she had never excluded anyone from it. Miceli argues that this concession bars a finding of adverse possession in favor of Beitler because the property was not held under claim of title or ownership. *See* Md. Courts and Judicial Proceedings Code Ann. § 5–103(a) (1989 Repl.). These statements must be considered in conjunction with her description of how she used the area during her testimony at trial. At trial Beitler stated that she moved to Glen Arm in September of 1967. Since that time she and her family added to the planting on the old railroad strip with ground cover and perennial flowers. They also maintained the greenery. The grass was mown, leaves raked, and plants pruned. Brambles and poison ivy were sprayed to prevent their encroachment onto the back yard.

When ruling on the question of Beitler's adverse possession the court expressly considered her representations at the deposition as to title. After argument the court found by a preponderance of the evidence that Beitler asserted adverse title for the statutory period:

I'm convinced by a preponderance of the evidence, 51 percent, that although weaker, it is still sufficient to show that what she was doing in that regard was making a claim, asserting an adverse title, her right to use in that particular situation and that she has in fact obtained title to that particular portion by adverse possession.

After a review of the record extract we are unable to find that this ruling was clearly erroneous.

### 3. *Bronzert*

■■■ Finally, Miceli complains that appellee Bronzert was improperly given title to the right of way because his use was not open and notorious. At trial Bronzert stated that he used the complete width of the right of way. He mowed and maintained the land, and posted "no trespassing" signs. Another witness, however, described the area adjacent to Bronzert's property as a "jungle."

The court found that Bronzert's use of the land was sufficiently adverse to award a grant of the strip of land. Merely because some of Bronzert's testimony was questioned by that of another witness does not warrant that we overturn the court's finding of fact.

### B. Collateral Estoppel [9]

Appellant next contends that the court erred in ruling that he was not the record owner of the former railroad right of way. He posits that because the Circuit Court for Baltimore County found in 1981 that the 1879 condemnation of the Wilson parcel was a taking in fee, the court *sub judice* was collaterally estopped from finding otherwise.

Stewart and Helen Jung purchased five parcels of real property at a Baltimore County tax sale.[10] The land consisted of what remained of the Maryland and Pennsylvania

---

**9.** At oral argument Miceli conceded that the Jungs' suit did not bar the action *sub judice* by collateral estoppel.

**10.** Although at least sixteen contiguous parcels were for sale, the Jungs purchased only five.

Railroad right of way through Baltimore County. Included among these parcels was one strip described as "Parcel No. 6 (hereinafter 'William Wilson')." The railroad had received the land through a condemnation proceeding. After the purchase of the five parcels the Jungs filed a Bill to Foreclose the Rights of Redemption. Ruling on this bill in April of 1981, Master Richard Payne declined to recommend a decree with regard to the Wilson parcel because, *inter alia,* the proceedings recognized neither the interests of the property owners, nor their heirs and assigns.

This decision was reversed by the Circuit Court for Baltimore County on November 17, 1981. The court noted that none of the documents pertaining to the Wilson parcel contained an express designation of right of way. It observed that the warrant granting the railroad's interest in the Wilson parcel stated in pertinent part that the railroad had a right to "enter upon ... and to take, use, occupy and possess for construction and repair of said Railway and of works connected therewith, a strip of land...." Construing these instruments as a whole the court found that the railroad, and thus the Jungs, held the parcels in fee simple.

Subsequently, on December 4, 1981, a fee simple interest in this land was deeded from Baltimore County to the Jungs. This deed specifically excluded a parcel previously deeded to Miceli:

> Being the same property taken under condemnation from William Wilson by the Baltimore and Delta Railway Station.... Saving and all that portion in a deed, dated January 29, 1962, and recorded in the land records of Baltimore County in Liber 3960, folio 428, which was conveyed by the Maryland and Pennsylvania Railroad Co. to Phillip V. Miceli containing 1.29 acres more or less.

Miceli now contends that his rights in the property emanate from the same condemnation as was examined in the *Jung* case. As the issue of the nature of the railroad's title is also before this Court, he argues, appellees are collaterally estopped from seeking relitigation of the same issue.

██ A pithy explanation of the doctrine of collateral estoppel may be found in the Second Restatement of Judgments, sec. 17, comment c at 149:

A valid and final personal judgment whether in favor of the plaintiff or of the defendant has a further effect— that of issue preclusion. In a subsequent action between the parties, the judgment generally is conclusive as to the issues raised in the subsequent action if those issues were actually litigated and determined in the prior action and if their determination was essential to the judgment.

Before the doctrine of collateral estoppel can apply, the second action must be between the same parties as the first or those in privity with them. *Klein v. Whitehead,* 40 Md.App. 1, 15, 389 A.2d 374 (1978). *See,* however, *MPC, Inc. v. Kenny,* 279 Md. 29, 34–36, 367 A.2d 486 (1977) for a discussion of the relaxation of this requirement.

██ In relitigation between the same parties, "even though the cause of action is different, any determination of fact, which is actually litigated in the first case, is conclusive in the second case." *MPC, Inc. v. Kenny, supra* at 32, 367 A.2d 486 *citing Sterling v. Local 438,* 207 Md. 132, 140–41, 113 A.2d 389, *cert. denied,* 350 U.S. 875, 76 S.Ct. 119, 100 L.Ed. 773 (1955). However, the Court no longer rigidly adheres to the doctrine that the parties need be *identical* for the doctrine to apply. *MPC, supra* 279 Md. at 34–36, 367 A.2d 486. *Accord, Klein v. Whitehead, supra* 40 Md.App. at 18, 389 A.2d 374. *See generally Blonder–Tongue v. University Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

In *MPC, supra,* the Court held that the requirement of identity of the parties for the purposes of collateral estoppel may be modified where its application acts to circumvent the public policy against repetitive identical litigation. *Id.* 279 Md. at 34, 367 A.2d 486. In light of this articulated public policy the Court sanctioned the application of collateral estoppel as a defense by an appellee who was not a party to prior litigation on an identical issue against an appellant who had previously litigated the same facts and

issues in a prior action. Appellants, the Court reasoned, had been afforded their day in court on those facts and issues. *Id.* at 35, 367 A.2d 486. The requirement of identity of the parties is relaxed only where "the party *against* whom the plea is asserted [was] a party or in privity with a party to the prior adjudication...." *Id. citing Bernhard v. Bank of America Nat. Trust & Sav. Ass'n.,* 19 Cal.2d 807, 122 P.2d 892, 893 (1942).

 In the case *sub judice,* Miceli's assertion that collateral estoppel bars litigation of the issue of the interest acquired by the railroad's condemnation is not persuasive because the parties in *Jung* and those before us now are not the same.[11] Because nothing in the record extract suggests to us that *any* of the parties in the *Jung* case are also parties here, we do not find that the doctrine of collateral estoppel is applicable.

The only parties that could be the same in both cases are the heirs of William Wilson. Assuming *arguendo* that the heirs of Wilson were named in *Jung,* they waived their right to be heard on the matter since there is no indication that they ever appeared to assert or defend any claim to the property.

Finally, the scenario presented by these facts does not fit into the narrow exception of the identity of the parties requirement outlined in *MPC, supra.* The Court in *MPC* explicitly relaxed this requirement to allow a party who never litigated an issue and seeks to use collateral estoppel as an affirmative defense against one who has. Miceli seeks to use the doctrine to bar appellees from asserting a right in the property. Appellees have not had their day in court on the issue of title to the railroad right of way prior

---

**11.** Though Miceli contends that joined in the case were the railroad and all persons claiming any interest in the property, he has failed to provide us with a list of any defendants other than Campbell, or a record extract from *Jung* which might list the defendants.

to the instant action. They will not be barred from asserting their rights now.

### III. *Record Ownership of Former Railroad Right of Way*

Miceli contends that the trial judge erred in ruling that he was not the record owner of the former railroad right of way.

 Miceli acquired title to this strip of land when he purchased it by quit-claim deed from the Maryland and Pennsylvania Railroad in 1962. The railroad acquired the property from William Wilson in 1879 through a condemnation procedure. The notice of condemnation stated that the railroad sought to condemn land:

> situated in Baltimore County for the use and occupation of so much thereof as the said company has found it necessary to *use and occupy* for the construction, running, and keeping in repair for said Railway Company to be constructed by said Company from Baltimore City to Delta Pennsylvania, the said land necessary to be used and occupied by said Railway Company.... (emphasis added.)

A determination of the type of interest acquired by a railroad's condemnation turns initially on the type of interest allowed by the legislative act permitting the company's condemnation:

> When the right of way is taken under the power of eminent domain, the nature of the estate appropriated depends on the statute conferring the power, or on the powers granted under the corporate charter. The policy of the courts is to strictly construe the grant of the power of eminent domain because it is in derogation of private rights. The policy of strict construction is implemented by the general rule that only such an estate in the property sought to be acquired by eminent domain may be taken as is reasonably necessary to carry out the

**568**

function of the condemner. If the statute or charter expressly and positively defines the estate to be taken, no other estate than that prescribed can be seized. It seems that it is not necessary for the statute or charter to expressly state that a fee simple is to be taken, if, by necessary implication, the intent be clear that a fee simple estate is to pass on condemnation, but, it is usually held that a railroad taking land under a statute or charter which does not clearly authorize it to take a fee, acquires only an easement.... If the charter or statute is permissive in character, conferring discretion on the company or court as to whether a fee simple estate or lesser interest is to be taken, then the nature of the interest taken will depend on the terms of the judgment in the condemnation proceedings.

Dyrud, *Railroad Rights of Way—Types of Interests Acquired*, 22 Md.L.Rev. 57, 63–64 (1962).

This State simultaneously authorized the consolidation of the Baltimore and Delta Railway Company, and codified the railroad's power of condemnation in the Laws of Maryland in Chapter 195 of the Laws of the State of Maryland for 1878. The Laws of Maryland provided that if the railroad was unable to agree on a price with the owner of the land sought, the company was to issue a warrant directed to the Sheriff of the county where the land is located "requiring him to summon a jury of twenty inhabitants of said county ... to meet on the land to be valued." *Id.* at 328–329. Once a panel of twelve jurors was selected, the Sheriff was instructed to administer to each of them an oath or affirmance:

that he will justly and impartially value the damages and benefits, which the owner or owners of said lands will sustain by the use or occupation of the same required by the said railway company....

*Id.* at 329. The jury was then to be instructed to "estimate and determine whether any, and if any, what amount of

damages has been or may be sustained by said owner or owners respectively, and shall make a report thereof accordingly, and the said jury shall reduce their inquisition to writing...." *Id.* The inquisition was to describe the property taken, and the quality and duration of the interest in the property for the company. The inquisition was to "entitle the said company to the estate and interest in the same thus valued as if it had been legally conveyed by owner or owners of the same...." *Id.* at 330.

In *State Roads Comm. v. Johnson,* 222 Md. 493, 497, 161 A.2d 444 (1959) the Court examined the question of the type of interest acquired by a condemning railroad. After examining Chapter 123, Acts of 1826 which incorporated the B & O Railroad, the court concluded that the statute did not confine the condemnor to the acquisition of easements; the railroad was authorized "in the exercise of its sound business judgment as to what was necessary or desirable, to acquire complete or fee simple title." *Id.* at 497, 161 A.2d 444.

The language contained in the statute authorizing the Maryland and Pennsylvania Railroad[12] to condemn property contains permissive language *identical* to that interpreted by the Court in *Johnson.* We, therefore, find *Johnson* to be controlling on the issue of the scope of the railroad's power to acquire an interest in property. The railroad, *sub judice,* had the authority to condemn and obtain either an easement or fee simple title in the Wilson's property.

We must ascertain the type of interest which the railroad, *sub judice,* acquired from William Wilson. The Court of Appeals has noted that where a condemnation is for the purpose of a railroad right of way there is a presumption

---

12. As stated, *supra,* the Maryland and Pennsylvania Railway Company was named the Baltimore and Delta Railway Company at the date of the condemnation.

that the grant is limited to use by the railroad as a right of way. *Johnson, supra* at 502, 161 A.2d 444.

As Nichols stated:

> [T]he proceeding in eminent domain, which involves the element of compulsion is in marked contrast to the effect of a voluntary conveyance between individuals. In the latter case, whenever it becomes necessary to construe the instrument of conveyance for the purpose of determining the extent thereof the rule is that the grantee will be allowed the greatest interest possible. In eminent domain, however, that construction must be adopted in the event of uncertainty, indefiniteness or ambiguity as leaves the owner with the greatest possible estate.

Nichols, *Eminent Domain* v. 3 § 9.2 (Rev. 3d ed. 1989).

■■■ Absent an express intention to convey a fee, a grant of a right of way to a railroad is generally considered to be an easement:

> In *Richfield Oil Corp. v. Railroad Co.*, 179 Md. 560, 20 A.2d 581 (1941), the phrase "right of way for railroad purposes" was used. In holding that this language "was the grant of an easement for railroad purposes and not a grant of the fee", Judge Collins said for the Court:
>
> "Quoting *Elliott on 'Railroads,'* (3rd Ed.), sec. 1158, pages 627 and 628: 'Where the intention to convey a fee does not appear, as in the conveyance of a "right of way" for the railroad through certain lands, the company takes an easement only.' Quoting *Lewis on 'Eminent Domain,' (3rd ed.) sec. 468; 'The conveyance of a right of way or for specified uses, conveys an easement only.' Quoting Jones on 'Easements,'* (1898 Ed.), sec. 212: 'Where the granting clause of a deed declared the purpose of the grant to be the right of way for a railroad, the deed passes an easement only, etc.' [citing other authorities] 1 *Thompson on Real Property,* page 533, sec. 420, defines 'a grant of a right of way to a railroad company to be the grant of an easement merely, and the fee remains in the grantor.' *Jones on Easements, supra,* sec. 211; 33 CYC *'Rail-*

roads,' page 169; *Smith v. Holloway,* 124 Ind. 329, 24 N.E. 886." *Id.* 179 Md. at 572–73, 20 A.2d 581.

See also *East Wash. Railway v. Brooke,* 244 Md. 287, 293–294, 223 A.2d 599 (1966), and Annot., 6 A.L.R.3d 973 (1966), entitled "Deed to Railroad Company as Conveying fee or Easement".

*D.C. Transit Systems v. S.R.C.,* 259 Md. 675, 677–678, 270 A.2d 793 (1970).

In *Hodges v. Owings,* 178 Md. 300, 13 A.2d 338 (1940) the Court examined the interest conveyed from Harry and Hattie Owings to the Chesapeake Beach Railway Company. The deed described the length and width of the right of way and also conveyed "the right to divert streams of water for Railroad purposes, and to take and use any stone or timber or other material within the limits of said strip of land as said Railroad is now located...." *Id.* at 301, 13 A.2d 338. Construing the deed, the Court noted that the railroad's charter authorized the taking of a fee. The Court held that because the purpose of the conveyance was for the construction of a railroad, and because use of resources on the land were limited to railroad use, the Owings intended to and did convey only an easement in the land. *Id.* at 305, 13 A.2d 338. In so holding the Court sought to reach the original intention of the parties. *Id.* at 304, 13 A.2d 338.

In the case before this Court, we hold that the trial court correctly construed the condemnation deed to convey only an easement in the property to the railroad. The express language of the jury's 1879 inquisition states that conveyance of the land was for the "use and occupation" of the railroad. The deed does not express an intention to convey a fee interest in the property. We find no indication in the inquisition that the railroad intended to take more than an easement in the disputed strip of land. As there is insufficient evidence to rebut the presumption that a condemning railroad takes an easement, we hold that the railroad did not acquire a fee simple absolute in the property at issue. The easement was abandoned when the railroad ceased

operation, use and occupation of its business in 1958. Miceli, therefore, acquired no interest when he acquired the land by quit-claim deed in 1962.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.