Filed 12/15/25



VERMONT SUPERIOR
COURT
Chittenden Unit
175 Main Street
Burlington VT 05401
802-863-3467
www.vermontjudiciary.org

CIVIL DIVISION

Case No. 25-CV-04286

**243 Colchester Avenue, LLC v. Nina O'Connor et al**

# ENTRY REGARDING MOTIONS

Title:     Motion for Preliminary Injunction; Motion for Miscellaneous Relief Related to Motion for Preliminary Injunction; Motion for Leave to File Sur Reply in Support of their Opposition to Plaintiff's Motion (Motions: 1; 2; 3)
Filer:     Gary F. Karnedy; Stephen F. Coteus
Filed Date:     October 02, 2025; October 23, 2025; November 18, 2025

This case involves a land dispute between Plaintiff 243 Colchester Avenue, LLC ("243") and Defendants Nina and Andrew O'Connor (the "O'Connors") in Burlington. 243 filed its motion for preliminary injunction to eject the O'Connors from a disputed portion of land where 243 asserts the abutting O'Connors have unlawfully trespassed and which the O'Connors say they have adversely possessed. 243 brings claims for trespass and quiet title. The O'Connors counterclaim for trespass and unjust enrichment (based on their purported improvements) and raise several affirmative defenses, including adverse possession. The parties each offered extensive documentary evidence in support of their positions. The court held oral argument on December 4, 2025, but took no evidence. The parties agreed the court could rule on the papers, mooting the O'Connors' Motion for Miscellaneous Relief.

For the reasons that follow, the court (1) DENIES 243's Motion for Preliminary Injunction (Mot. 1); (2) DISMISSES as moot the O'Connors' Motion for Miscellaneous Relief Related to Motion for Preliminary Injunction (Mot. 2); and (3) GRANTS the O'Connors' Motion for Leave to File Sur Reply in Support of their Opposition to Plaintiff's Motion (Mot. 3).

### A. Background

The court makes the following findings of fact based on a preponderance of the credible evidence submitted for the purposes of deciding the motion for preliminary injunction. The court makes no findings as to the ultimate merits at trial where 243 has demanded a jury. The parties do not controvert much of the evidence presented by their counterpart, with one exception of limited relevance noted below. Their evidentiary submissions are largely complementary, rather than contradictory. They unsurprisingly take very different views of the legal significance of the various events to date.

243 owns a parcel of land in Burlington (the "Land"), a portion of which abuts the O'Connors' property. (Pl.'s Cannizaro Aff. ¶¶ 4-6.) The Land also abuts approximately 17

other immediately adjacent plots. (Pl.'s Ex. 4.) From the late 1970s through 2025, 243 corresponded with several of the adjoining landowners (not the O'Connors) regarding their use of the Land, requests to remove trees on the Land that impinged the abutters and to field requests by several abutters to purchase portions of the Land. (Pl.'s Ex. 11.) 243 consistently declined to sell portions of the Land. (*Id.*) The correspondence shows that 243 sometimes initiated the correspondence when it discovered a perceived encroachment, for instance. (*Id.*) Other times, 243 responded to correspondence initiated by its neighbors. (*Id.*) Besides this history of regular but unsystematic correspondence, 243 offered no evidence regarding what else it did before 2019 to make itself aware of activities by its abutting neighbors, including the O'Connors.

Beginning in 2008, without notifying 243, the O'Connors began using a portion of 243's Land (the "Woods") where they blazed walking trails, installed fencing, maintained animals, constructed assorted structures and otherwise used the Woods, all of which continues today. (Defs.' Andrew Teague O'Connor Aff. ¶¶ 7-35; Defs.' Ex's. B, F, N, CC, JJ, RR, YY, BBB.) 243 did not learn of the O'Connors' activities until 2019 when it entered the Woods to survey and stake the Land, including the Woods, (Pl.'s Cannizaro Aff. ¶ 10), apparently the first time 243 visited the Woods during the time period relevant to this case. 243 did nothing else to the Woods or to the O'Connors at that time. (*Id.* ¶¶ 10-11; Defs.' Sophia Kruszewski Aff. ¶10.) 243 surveyed the Woods again in 2025 and shortly thereafter wrote to the O'Connors to ask them to remove their personal property from the Woods. (Cannizaro Aff. ¶¶ 13-14.) The O'Connors declined. (*Id.*)

243 asserts that the O'Connors "clandestinely" (Pl.'s Mot. at 3, 7) undertook their "hidden" (*id.* at 3; Pl.'s Rep. at 13) activities in the Woods between 2008 and 2019 but offered little to no evidence to support those characterizations. For example, 243 provided aerial photographs as illustrations of what satellite photographs detected in the woods. Those images show visible trails in 2016 (Pl.'s Ex. 11, at 3) and outbuildings in 2018 (*id.* at 4). 243 disputes the legal significance of the O'Connors' varied fencing over the years. (Pl.'s Rep. at 10-12). Yet 243 offered no evidence to controvert that the O'Connors did what they say they did in the Woods during 2008-2019. Similarly, 243's correspondence with other abutters contains no correspondence with the O'Connors. (Pl.'s Ex. 11.) Some of the correspondence plainly evidence that 243 had itself observed possible encroachments and other concerns from other abutters. (*E.g.*, *id.* at 22). Yet 243 offered nothing to explain why it never observed the O'Connors' ongoings in the Woods. It noted only that the Woods are not visible from one portion of the Land. (Pl.'s Cannizaro Aff. ¶6.) To restate the obvious, these approximately 18 abutting neighbors (including the O'Connors) are abutting neighbors of 243 – nothing lies between their respective lands and the Land. (Pl.'s Ex. 4.) In other words, 243 has direct access to the Woods from the Land. Consequently, for the purposes of this motion, this court finds nothing clandestine about the O'Connors' activities in the Woods during 2008-2019.

At and after oral argument, the parties offered proffers about the possibility of a prospective purchase of the Land by an adjacent institutional property owner. (Dec. 8, 2025 oral proffer from Pl.; Defs.' Ex. EEE.) Their collective proffers make clear there exists a

2

possible but not probable such opportunity. Given the discussion below, this point has little bearing on the pending motion.

Finally, the court explored with the parties at hearing the possibility of more limited injunctive relief in the form of paragraphs 1-2 of 243's October 2, 2025 proposed injunction. Both parties objected, with 243 asserting it would not go far enough and the O'Connors claiming it would go too far.

In short, 243 says the O'Connors' actions cloud its title to the Land and wants the O'Connors, their structures and activities out of the Woods. The O'Connors in turn claim the Woods as their own, having acquired them by adverse possession and bring their quiet-title counterclaim to make their ownership official and their unjust enrichment counterclaim to seek recompense for their purported improvements to the Woods.

## B. Discussion

"'A preliminary injunction is an extraordinary remedy never awarded as of right.'" *Taylor v. Town of Cabot*, 2017 VT 92, ¶ 19, 205 Vt. 586 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "Because of the often drastic effects of the temporary injunction, the power to issue it must be used sparingly, and only upon a showing of irreparable damage during the pendency of the action . . . ." *State v. Glens Falls Ins. Co.*, 134 Vt. 443, 450 (1976). The plaintiff must establish likelihood of irreparable harm and the court also has to consider "the potential harm to the other parties; . . . the likelihood of success on the merits; and . . . the public interest," *Taylor*, 2017 VT 92, ¶ 19, "balanc[ing] the competing claims of injury and . . . consider[ing] the effect on each party of the granting or withholding of the requested relief." *Id*. (quoting *Winter*, 555 U.S. at 7). The test "is sufficiently flexible to allow for a preliminary injunction in cases in which the court cannot definitively conclude that the movant is likely to prevail on the merits, but the balance of other factors tips strongly in favor of an injunction." *Taylor*, 2017 VT 92, ¶ 19 n. 3. "Ordinarily, the 'movant bears the burden of establishing that the relevant factors call for imposition of a preliminary injunction'" but "'[t]he burden on the likelihood-of-success factor . . . tracks the burden at trial.'" *Protect Our Wildlife v. Fish and Wildlife Bd.*, No. 24-CV-00189, 2024 WL 1492588, at *2 (Vt. Super. Ct. Feb. 22, 2024) (Tomasi, J.) (citations omitted). "Although each factor is important, '[t]he showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction, and the moving party must show that injury is likely before the other requirements for an injunction will be considered.'" *D'Ambrosio v. Scott*, 784 F. Supp. 3d 699, 702 (D. Vt. 2025) (citation omitted). "In sum, the court's role today is not to rule on the ultimate merits of the claim, but to predict whether [plaintiff] is likely to succeed in the future on the merits of its claims, and if so, balancing the other criteria for a preliminary injunction." *American Environmental, Inc. v. Burlington School District*, Case No. 23-CV-00054, 2023 WL 2137953, at *2 (Vt. Super. Ct. Feb. 4, 2023) (Toor, J.).

1. **243's Likelihood of Irreparable Harm and the Potential Harm to the O'Connors**

The Vermont Supreme Court has long and consistently held that a continuous trespass justifies injunctive relief as a matter of law. *E.g.*, *State v. Preseault*, 163 Vt. 38, 43 (1994) ("Vermont law is clear that even the threat of continuous trespass entitles a party to injunctive relief.") (citations omitted); *S. L. Garand Co. v. Everlasting Mem'l Works, Inc.*, 128 Vt. 359, 362 (1970) (noting that "[i]n boundary disputes, if the trespass is continuing, with repeated acts done or threatened, the legal action for each single and separate wrongdoing provides relief which is insufficient and unduly burdensome" so "equity has jurisdiction to correct the entire wrong and avoid further repetition by injunctive relief") (citations omitted); *Begin v. Barone*, 124 Vt. 421, 422 (1965) ("Damages are inadequate relief to a 'continuing trespass', since it breeds a multiplicity of suits and fails to accord the obstructed party [their] rightful access, although [they] show[] [the]msel[ves] to be so entitled.") (citation omitted); *Barrell v. Renehan*, 114 Vt. 23, 25, 39 (1944) ("If the trespass is continuous in its nature, if repeated acts of wrong are done or threatened, although each of these acts taken by itself may not be destructive, and the legal remedy may therefore be adequate for each single act if it stood alone, then also the entire wrong will be prevented or stopped by injunction on the ground of avoiding a repetition of similar actions.") (citations omitted). 243 has thus established irreparable harm as a matter of law.

The O'Connors agree with this "uncontroversial legal principle," (Defs.' Opp. at 14), but seem to suggest their "improvements" to the Woods cut against issuing an injunction. (*Id.* at 14-16 (noting 243 has "not articulate[d] any particular damage" and the O'Connors "have cleaned up and improved" the Woods).) The O'Connors have devoted only about ½-page of their 28-page opposition and 10-page sur-reply to outline the harm they could suffer from the requested injunction, saying they have "much to lose" from the "herculean task" of removing their "improvements" from the Woods that "would likely kill or jeopardize [their] plants and animals that have been living" there. (*Id*. at 25.) The O'Connors have made clear through their submissions their passion for naturalism and affection for the Woods. They have not provided legal support for how those interests should weigh as a matter of law in the court's balancing of harms. The court has also found none. 243 has offered to post a bond for the less than $5,000 in economic value of the investments they have made in the Woods. (Defs.' Andrew Teague O'Connor Aff. ¶ 37.) 243 withdrew at the hearing its request that the O'Connors remediate the land beyond removing the personal property. These factors further minimize any potential harm to the O'Connors. On balance, therefore, this factor favors 243. The court finds 243 has carried its burden to prove that a continuous trespass constitutes irreparable harm as a matter of law for the purposes of seeking a preliminary injunction under Rule 65.

2. **Likelihood of Success**

Assessing 243's likelihood of success at trial requires more than assessing the strength of its trespass claim against the O'Connors. (Pl.'s Mot. at 7.) It requires the court to determine the likelihood of success of the O'Connors' affirmative defense of adverse possession. (Defs.' Answ. at 6.)

4

In this case, the parties have different views on some critical facts relevant to the O'Connors' adverse possession claim. The court notes three areas particularly relevant to the likelihood of success assessment. First, as previously noted, they differ on when the O'Connors first occupied the Woods, with 243 maintaining "[s]ometime after 2016," (Pl.'s Mot. at 3,) and the O'Connors asserting as early as 2008. (Defs.' Opp. at 7-8.) Second, they have different views of the timing, scope and significance of fencing installed by the O'Connors at various times. (Pl.'s Rep. at 13, Ex. 4; Defs.' Opp. at 5, Ex. B.) Third, the parties diverge on the significance of 243's surveying and staking the Woods in 2019 – in particular, whether it sufficed as a matter of law to interrupt the O'Connors' adverse possession claim. (Pl.'s Mot. at 3; Defs.' Opp. at 22.)

"'To achieve title through adverse possession, a claimant must demonstrate that possession of the land was open, notorious, hostile and continuous throughout the statutory period of fifteen years.'" *MacDonough-Webster Lodge No. 26 v. Wells*, 2003 VT 70, ¶ 24, 175 Vt. 382 (citation omitted). "The claimant has the burden of establishing all of these elements." *Jarvis v. Gillespie*, 155 Vt. 633, 638 (1991) (citation omitted). "Acts of possession are deemed sufficiently open and notorious if they are conducted in a manner which would put a person of ordinary prudence on notice of the claim." *Jarvis*, 155 Vt. at 641 (holding that visibility to claimant's land use from an abutting public road and testimony from a longtime town clerk that claimant claimed ownership sufficed) (citation omitted). A claimant may thus satisfy the "open and notorious" requirement through either actual or constructive knowledge. *E.g.*, Restatement (First) of Property § 459 cmt. i (1944) (noting "[t]he use may be such as to be apparent upon an ordinary inspection of the premises" or "of such common knowledge in the community" so as to give the titleholder "a reasonable opportunity to learn of it by availing themselves of such knowledge"). Consistent with these concepts, the Vermont Supreme Court has affirmed adverse possession claims for mining operations unnoticed by the physically absent title holder. *N.A.S. Holdings, Inc. v. Pafundi*, 169 Vt. 437, 444 (1999).

Fencing claimed land can also prove relevant, but not dispositive. "[T]he fence must have been erected and maintained for the purpose of inclosing the land as the property of the person who seeks to make adverse title to it, and not for his convenience in the occupation of his other lands, and this must appear." *Lyon v. Parker Young Co.*, 96 Vt. 361, 364 (1923). The *Lyon* court affirmed the chancellor's ruling for the adverse possession claimant relying in part on claimant's fence which encompassed nearly the entire area of the land claimed and on which he had conducted logging, sugaring and pasturing operations for two generations. *Id.* No case found by this court creates a per se rule about fencing or any other single activity involved in this case. *E.g.*, *First Congregational Church of Enosburg v. Manley*, 2008 VT 9, ¶¶ 15-16 (finding inconclusive fencing originally for animals and sporadically maintained thereafter); *MacDonough-Webster Lodge No. 26*, 2003 VT 70, ¶ 28 ("Marking a claim to land with a fence is an indication of an intent to possess which, if combined with other acts of possession, can establish the presumption that land is held adversely up to the fence."); *Thurston v. Batchellor*, 100 Vt. 334, ¶¶ 9-10 (outlining that "fence must have been erected and maintained for the purpose of inclosing the land as the property of the person who seeks to make adverse title to it, and not for his convenience in the occupation of his other lands, which must appear").

5

At the same time, "'[i]t is presumed that the use of land by one who has record title is the exercise of his right to enjoy it, and such use interrupts the continuity of adverse possession by another.'" *MacDonough-Webster Lodge No. 26*, 2003 VT 70, ¶ 24 (quoting *Harlow v. Miller,* 147 Vt. 480, 483 (1986)).  Uses that can interrupt claims of adverse possession include activities like periodically mowing or maintaining disputed land, *e.g.*, *Harlow,* 147 Vt. at 483, "logging, pasturing and grazing," *Rueda v. Kuban*, 133 Vt. 584, 585 (1975) or maintaining a flower garden.  *Camp v. Camp*, 88 Vt. 119, 120 (1914).  Although apparently not yet addressed in Vermont as far as this court can tell, most courts have held that surveying by the record landowner will not by itself interrupt adverse use.  *E.g.*, *Miceli v. Foley*, 575 A.2d 1249, 1258 (Md. Ct. Spec. App. 1990) (holding that three surveys over two years with surveyor walking property with record owner did not interrupt adverse use).  "Before the holder of record title can regain what he has lost . . . '[h]e must assert his claim notoriously and openly, or perform some act which will reinstate him in possession.'"  *Id*. (quoting *Rosencrantz v. Shields,* 28 Md. App. 379, 392, 346 A.2d 237 (1975)).  The *Rosencrantz* court found that no court which had confronted the question had found that survey entry without more would interrupt an adverse claim of possession.  *Rosencrantz*, 28 Md. App. at 390-93 (discussing decisions from Kentucky, Louisiana, New Hampshire and Rhode Island as well as commentary from Corpus Juris Secundum and American Jurisprudence 2d).  "Rather, we hold that the conducting of the survey must be accompanied by an intent to recover possession or exercise dominion over the property."  *Crown Credit Co. v. Bushman*, 869 N.E.2d 83, 91 (Ohio Ct. App. 2007).  *See also Pugatch v. Stoloff,* 671 N.E.2d 995, 1000 (Mass. App. Ct. 1996) ("Moreover, notice to an adverse possessor of the result of a survey, without more, is insufficient to establish such an exercise of dominion over the disputed area as to interrupt adverse possession.").

Likewise, "[m]ere verbal protestations without action to reassert control or dominion over the disputed land does not interrupt the adverse possessor's interest in the property, but only confirms that the occupation is hostile."  *Brown v. Whitcomb*, 150 Vt. 106, 110 (1988) (citation omitted).

> If the interruption is produced by an act not involving a judicial determination, the act must be intended to cause and must be of such a character as actually to cause a cessation of use. The cessation of use may be merely temporary, but if it actually occurs as a result of an act of the possessor of the land done for that purpose there is an interruption. An act by the possessor of land intended to cause a cessation of use does not produce an interruption of use unless a cessation of use, temporarily at least, results. The success of the act in causing a cessation of use rather than its form or manner determines its effect as an interruption. Thus, while neither physical obstruction nor verbal or written protest, when disregarded, causes an interruption of use, either, when acquiesced in, is effective to produce an interruption.

6

Restatement (First) of Property § 459 cmt. c (1944). In other words, whether merely by surveying or by letters, a title holder does not interrupt adverse possession unless they physically interrupt the claimant's occupancy.

Applying these principles to this case, this court finds that 243 has not met its burden to prove a likelihood of success on the merits at trial. This court has already found that, for the purposes of this motion, the O'Connors occupied the Woods beginning in 2008. 243 offered no controverting evidence. It only offered evidence regarding when it discovered the O'Connors' activities, not when it could have. Nor did 243 offer sufficient evidence establishing that it broke the O'Connors' occupation of the Woods. On this evidence, a reasonable jury could find that the O'Connors have established their adverse possession defense. As a result, the court finds that 243 has not proven its likelihood of success at trial. This factor favors the O'Connors.

### 3. Public Interest

This factor follows the previous one. Whether injunctive relief advances the public interest depends on whether this case involves an unlawful trespass or a lawful establishment of adverse possession. One the one hand and by 243's account, one could look at this case as protecting the private property interests of a deeded landowner suffering an unlawful trespass. On the other hand and in the O'Connors' minds, one could look at this case as demonstrating why the Vermont legislature codified the common law doctrine of adverse possession in 12 V.S.A. § 501. The cases cited by the parties' extensive briefing and exhibits illustrate that the law favors vindicating both public policies, depending on the circumstances ultimately found actually to exist in this case. Just as 243 has not carried its burden to prove a likelihood of success against the O'Connors' adverse possession defense at trial, 243 has likewise not carried its burden to prove that this case will vindicate the public interest that private property holders have against trespass versus the public interest in advancing the Vermont legislature's codification of common law adverse possession. Where 243 has the burden and has not carried it, this factor favors the O'Connors.

## C. Summary

243 has demonstrated as a matter of law that it will suffer irreparable harm from the O'Connors' continuing trespass. Yet it has not shown a likelihood of success on the merits at trial. Nor has it identified a public interest vindicated by the preliminary injunction it seeks. 243 has, therefore, failed to meet its burden in showing why the court should issue the requested preliminary injunction.

At the December 4, 2025 hearing, the O'Connors conceded that they did not require an evidentiary hearing or site visit to resolve the preliminary injunction, mooting their Motion for Miscellaneous Relief. The court has considered their proposed sur-reply in reaching this decision, effectively granting their Motion for Leave to File Sur-Reply.

7

**D. Order**

For the reasons discussed above, this court: (1) DENIES 243's Motion for Preliminary Injunction (Mot. 1); (2) DISMISSES as moot the O'Connors' Motion for Miscellaneous Relief Related to Motion for Preliminary Injunction (Mot. 2); and (3) GRANTS the O'Connors' Motion for Leave to File Sur Reply in Support of their Opposition to Plaintiff's Motion (Mot. 3).

The parties shall jointly file a discovery schedule and proposed order by January 16, 2026.

Electronically signed pursuant to V.R.E.F. 9(d) on December 11, 2025.

Colin Owyang
Superior Court Judge

8